(No. 18356.—Reversed and remanded.)
SILAS M. DIAL et al. Appellants, vs. WILL P. WELKER
et al. Appellees.

*Opinion filed December 21, 1927.*

WILLS—*when presumption of undue influence arises—instruction.* The facts that a chief beneficiary was attorney for the testator and transacted many of his business affairs, and that, although there is no direct evidence that he prepared the will, he accompanied the testator when he executed it and superintended its execution by the testator and the attesting witnesses, raise the presumption that undue influence induced the execution of the will and place the burden on the proponents, in a contest case, to prove that the will was freely and voluntarily executed by the testator; and it is error to instruct the jury that to raise the presumption of undue influence it is necessary to prove that the attorney "actually prepared the will."

APPEAL from the Circuit Court of Fayette county; the Hon. THOMAS M. JETT, Judge, presiding.

BROWN & BURNSIDE, and CARL E. ROBINSON, for appellants.

HOGAN & REESE, JOHN A. MATHENY, and NOLEMAN & SMITH, for appellees.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Joseph Welker, of Fayette county, died testate January 8, 1926, leaving as his heirs his brother, Morris Welker, his nephews, Silas M. Dial, John H. Dial, William Ireland, Emanuel Ireland and Noble Ireland, sons of a deceased sister, and a niece, Clarissa Griffith, daughter of another deceased sister. By the will, which was admitted to probate, he gave all his property to John F. Welker, Will P. Welker and Frances Sealock, children of Morris, and named Will as the executor. His heirs, excepting his brother Morris, filed a bill in the circuit court of Fayette county asking that the probate of the will be set aside and

that the instrument be declared not to be the will of Joseph
Welker for the reason that he was not mentally competent
to make a will and that it was the result of the undue in-
fluence of the beneficiaries.   There was a trial and a ver-
dict sustaining the will.   This appeal followed.

The will was executed at the Second National Bank, in
Danville, December 3, 1924, and was witnessed by Woods
H. Martin, Bryant Tenary and D. W. Moore.   At that
time Welker was a resident of the Old Soldiers' Home, at
Danville, and had been since January 31, 1911.   He was
seventy-five years old, and since 1920 had not been able to
talk or write because of paralysis affecting his throat and
his right hand.   Martin testifies that he had observed him
at different times entering and leaving the bank as a cus-
tomer during a period of about five years and from his
observance of him thought he was of sound mind.   On the
morning of the execution of the will Joseph Welker came
into the bank in company with another resident of the
soldiers' home, and his nephew, Will P. Welker.   The lat-
ter produced an unsigned paper from his pocket and said
his uncle desired to execute it as his will.   Will asked that
two additional witnesses be produced, and Martin called
Tenary and Moore.   The document was read to Joseph in
the presence of Will and the three witnesses, and when the
reading was finished Martin asked Joseph whether that was
his will, and Joseph made a sound which they understood
to mean "Yes."   Martin signed Joseph's name to the will
and Joseph touched the pen while his mark was made.   The
three witnesses signed as witnesses to the mark and to the
will.   Will Welker asked Martin to keep the will, and Mar-
tin placed it in a box in the vault.   Tenary and Moore tes-
tify to substantially the same facts, and express the opin-
ion that Joseph Welker was of sound mind at the time he
executed the will.

Robert J. Hart, who operated a store and restaurant
at the soldiers' home, and two waitresses employed by him,

testified that Joseph Welker frequently ate at the restaurant and bought tobacco there, and that, based on such transactions, they believed he was of sound mind. W. T. Christy, who was a clerk in the office of the governor of the soldiers' home, testified that Joseph Welker served as a captain at the Home until he became ill, in 1920. Before his illness he served as republican precinct committeeman and was active in politics around the Home. The only business which Christy saw Joseph transact after 1920 was when Joseph brought to him a letter from Will P. Welker, to which was attached an unsigned document which Joseph indicated he wanted to sign. It was a receipt for notes and cash totaling $50,000, which was required by the administrator of the estate of Illinois W. Hess, deceased. Christy asked him whether he understood the contents of the document, and he indicated that he did. Christy signed Joseph's name to the receipt and assisted him in making his mark and then witnessed the mark. From his contact with Joseph he formed the opinion that he was of sound mind. Abraham R. Darling, governor of the Home, also had witnessed this transaction, and expressed the opinion that Welker had sufficient mental capacity to transact ordinary business. Dr. William J. Whitfort, of St. Elmo, testified that he treated Welker a few times after November, 1925, and that in his opinion he was of sound mind. Mr. and Mrs. Louis J. Sandage, at whose home Welker lived from November 18, 1925, until he died, were of the same opinion.

Morris Welker testified that his brother Joseph worked as a tile ditcher before he went to the soldiers' home; that while he was not an educated man he was a man of ordinary intellect and took an active interest in public affairs. They had a niece, Illinois W. Hess, of Effingham, who had considerable property but who became incompetent to transact her business. Marvin Griffith, the husband of their niece Clarissa, was appointed conservator, but Joseph be-

came dissatisfied with his management of the estate. Finally, Griffith was removed and B. F. Kagy was appointed as his successor. After Mrs. Hess died, in May, 1924, the contestants in this case claimed a portion of the estate, but it was finally distributed equally between Morris and Joseph Welker. They received about $75,000 each in personal property and $10,000 each in real estate. Between November 16, 1924, and the date of the execution of the will, Joseph visited at the home of his brother Morris, with whom lived Frances Sealock and her husband. During this visit Frances talked to Joseph about the disposition of his property. Morris testifies that she asked Joseph whether he wanted all his property to go to the children of Morris, and that he said "Yes." She said, "You don't want the Ireland heirs to have any of your property?" and he said "No." When she asked him whether he wanted to give something to Clarissa Griffith he said "No." After this conversation Frances reduced it to writing and then read it over to him. This memorandum was delivered to Woods H. Martin by Will P. Welker at the same time that the unexecuted will was delivered. Morris did not remember that Joseph made any trips to Vandalia during the time he was visiting at his home in November, 1924, and did not see in Joseph's possession the will which he executed shortly thereafter. After his visit was over he was taken to the train at St. Elmo and returned to the soldiers' home.

Louise Martin testified that she was employed at the Second National Bank, in Danville, from 1920 to 1924 and had charge of the safety deposit boxes. Joseph Welker had a box there and came once a month to cash his pension check and to put money in the box. She urged him to open a savings account, but he did not follow her advice until the box became so full that the money fell on the floor when he opened it. Finally she obtained his consent to let her open a savings account for him and deposit the money which he had in the box. From her experience with

him she formed the opinion that he was not of sound mind. Grace Seiter, who succeeded Mrs. Martin at the bank and who saw and waited upon Welker about once a month after September, 1924, when he came to cash his pension check and deposit his money, was of the opinion that he was not of sound mind.

Paul Taylor, an attorney of Effingham, who represented the conservator of Mrs. Hess during her lifetime and the administrator after her death, testified that the estate consisted principally of notes secured by mortgages; that when distribution was made, the notes and mortgages were turned over to Will P. Welker for the distributees; that receipts were obtained from the distributees by Will P. Welker and by him returned to the administrator; that the first distribution was made in March, 1925, and the final distribution about three months later. At the same time he executed the will in question at the Second National Bank, in Danville, Joseph Welker executed a general power of attorney giving to Will P. Welker authority to receive and receipt for all property due him as heir of Illinois W. Hess, and giving him full power to collect the principal and interest on all bonds and notes, to invest all funds and to execute, sign and deliver all necessary instruments, and do all things in the management of his affairs as fully and completely as if he were personally present and acting in his own behalf. Will P. Welker produced this unexecuted power of attorney at the same time he produced the unexecuted will and delivered both to Martin at the bank. He testified that he dictated the power of attorney to his stenographer in his office in Vandalia and that she wrote the document.

Mrs. Ira Shaw testified that on an occasion when she was at the railway station at St. Elmo waiting for a train she saw Mr. and Mrs. Sealock arrive with Joseph Welker. When the train arrived she and Joseph boarded it and she then saw Will P. Welker on the train. Joseph took a seat beside him. When they had traveled a short distance Jo-

seph acted excitedly and pointed back toward St. Elmo. Will took a paper out of his pocket and showed it to him and said, "Here it is, Uncle Joe; it is all right." He seemed to understand what Will was talking about and became quiet. She was unable to fix the year exactly, but other facts in evidence show that this trip was the one made December 3, 1924, when Will went to Danville with Joseph to have the will executed.

Dr. E. J. Wheatley, who was connected with the soldiers' home as a surgeon from 1914 to 1917 and who has practiced medicine in Danville since he returned from service in the World War in 1919, treated Joseph Welker on many occasions. He saw him several times at his office in 1923 and 1924, and from his observation of him formed the opinion that he was not of sound mind.

Alverdo Basset, a resident of the soldiers' home, accompanied Joseph Welker on many of his trips down-town. He was with him when the will was executed at the Second National Bank but did not sign the will as one of the witnesses. After his illness in 1920 Joseph was not able to express himself except by signs. When he wanted to go down-town he would attract Basset's attention and then go to the latter's closet and point to his street clothes. If he wanted Basset to go with him to buy a pair of shoes he would point to Basset's shoes. Often he would start down-town for something and forget what it was. Basset did most of his writing for him. He would read Joseph's letters and then say to him, "Do you want me to say so and so?" and he would answer "yes" or "no." When Basset had found out what Joseph wanted written he would write and mail the letter. From his observation of Joseph he was of the opinion that he was not of sound mind at the time he executed the will.

The evidence concerning the mental capacity of Joseph Welker to execute a valid will is conflicting, and on this question the court properly refused to direct a verdict in

favor of either party. However, it clearly appears that Joseph was not a strong man mentally or physically in December, 1924, and because of his condition was peculiarly subject to the influence of those around him. The uncontradicted evidence is that for two weeks prior to the execution of the will he was in the home of one of the beneficiaries and she discussed with him the disposition of his property by a will. This was shortly after the death of his niece, from whom he inherited a large estate. He was accompanied to Danville by another of the beneficiaries, who was then acting as his attorney in the matter of the settlement of his niece's estate and as his confidential agent in the management of his business affairs. This beneficiary carried with him an unexecuted power of attorney giving himself full control of Joseph's recently acquired wealth, which he admits he prepared, an unexecuted will naming himself a beneficiary, which all the circumstances show that he also prepared, and a memorandum of a conversation between another beneficiary and the testator concerning a disposition of his property by will. Proof of these facts establishes *prima facie* that the execution of the will was the result of undue influence exercised by these beneficiaries. (*Gum* v. *Reep,* 275 Ill. 503;˙ *Yess* v. *Yess,* 255 id. 414; *Leonard* v. *Burtle,* 226 id. 422.) This evidence on behalf of the contestants is met by the testimony of the attesting witnesses that the will was read to the testator and that he said it expressed his desire, and the testimony of Morris Welker that the testator gave directions to have his will prepared as it was. The credit to be given this evidence was for the jury, and the court properly refused to direct a verdict on this issue.

The seventh instruction given at the request of the proponents reads:

"You are further instructed upon the question of undue influence that undue influence cannot be presumed, but the burden of proof is upon the contestants to show by evi-

dence that the making of the will was obtained by undue influence, and in order to set aside the will on the ground of undue influence it must appear from a preponderance of the evidence that if undue influence was employed that it was such influence or restraint as caused the execution of the will by the decedent against his own preference and will in the matter. You are further instructed that even advice or persuasion to induce the testator to make a will, or to influence the disposition of his property by will is not undue influence."

This instruction is contrary to the law as stated in *Seavey* v. *Glass,* 315 Ill. 611, and other cases there cited.

The eighteenth instruction given at the request of the proponents reads as follows:

"Even though you may believe from the evidence that Will P. Welker was the attorney for the deceased, Joseph Welker, in his lifetime and looked after his business matters for him, still no presumption of undue influence will arise from that relation alone unless you further believe from the evidence that the said Will P. Welker actually prepared the will in question or used the relation existing between him and the said Joseph Welker for the purpose of unduly influencing him to make the will in question."

This instruction is contrary to the law announced in *Weston* v. *Teufel,* 213 Ill. 291, and many other cases. Proof of the relationship of attorney and client, and of the fact that the beneficiary, in whom trust and confidence were reposed by the testator, prepared or procured the preparation of the will by which he profits, raises the presumption that undue influence induced the execution of the will. Such proof casts upon the proponents, if the will is to be sustained, the necessity of producing evidence to show that its execution was the result of free deliberation on the part of the testator and of the deliberate exercise of his judgment. It is not necessary, as the instruction states, to prove that the attorney "actually prepared the will."

Other instructions were given at the request of proponents which stated the law correctly as to undue influence arising from coercion or active fraud but which did not state the law correctly in a case like the one at bar, where the undue influence charged was that resulting from the abuse of a fiduciary relation existing between the parties.

Because of error in the instructions the decree is reversed and the cause is remanded to the circuit court of Fayette county.

*Reversed and remanded.*