(No. 44694.—

*In re* CHARLES JOHN ANDERSON, Attorney, Respondent.

*Opinion filed September 20, 1972.*

UNDERWOOD, C.J., and SCHAEFER, J., dissenting in part.

ANNA R. LAVIN, for respondent.

C. WILLIAM FECHTIG, of Carmi, *amicus curiae.*

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

The Board of Governors of the Illinois State Bar Association, sitting as Commissioners of this court under Rule 751 (Ill.Rev.Stat. 1971, ch. 110A, par. 751), has recommended that Charles John Anderson, the respondent, who was admitted to the practice of law in this State in 1946, be disbarred. Although the Commissioners made numerous findings of professional misconduct arising out of respondent's dealings with his "sister-like friend" and client, Verna Johnson, a spinster, during her lifetime, and during the administration of her estate after her death, we shall, in this opinion, discuss only those findings which are challenged in respondent's brief.

Shortly after the death of Verna Johnson on February 25, 1966, respondent mailed to various of her heirs entries of appearance and consents to have a stranger act as administrator. One of the heirs, Ann Hay, took respondent's letter and the entry of appearance and consent to John Cook, an attorney. After several phone conversations and some correspondence with respondent, Cook effected the appointment of Mrs. Hay as administrator of the

estate. The probate proceedings were had in the circuit court of Lake County. Cook learned that the home in which Miss Johnson and her mother had lived and in which Miss Johnson resided at the time of her death was in a land trust created on July 2, 1964, with Elmhurst National Bank as trustee, and inquired of respondent whether he had any knowledge of the matter. Respondent told him that the beneficial interest in the land trust was in a joint tenancy comprised of the deceased, Miss Johnson, and another party who was not related to her, but declined to identify the surviving joint tenant. Several weeks later he advised Cook that he was the surviving joint tenant. Cook also learned that there was a savings account with the Deerfield Savings and Loan Association in which Miss Johnson and respondent were joint tenants.

Several months later, after additional conversations and correspondence between Cook and respondent, the administrator filed a "petition for citation to discover information" alleging that respondent was in possession of information concerning the land trust and the savings account and praying that he be ordered to appear for interrogation. The citation was issued and after three hearings the administrator and respondent entered into, and the circuit court of Lake County approved, a settlement agreement under the terms of which respondent paid the administrator the sum of $12,000 and assigned to her his interest in the land trust.

Respondent contends that there is no evidence to support the finding that he overreached his client in the creation of the joint tenancies. He argues that "The land trust agreement and the joint bank account were in existence for two years before Verna Johnson died. Both transactions required affirmative actions by her which, from the evidence, she entered into freely and with no apparent or written or voiced dissent."

Respondent did not testify in the disciplinary pro-

ceeding and the only testimony offered to explain the creation of the joint tenancies was taken during the hearings held in connection with the citation proceeding. At the first citation hearing respondent testified he had put $5000 into the savings account in which there was a balance of $5300 at the time of Miss Johnson's death. In the second hearing he stated that he had given Miss Johnson and her mother $5000 in cash and checks over a period of years and that Miss Johnson wanted him to have the account at her death, for the reason that it was really his. To support this contention he produced, at the court's direction, checks he had written to decedent and her mother. In her income tax return Miss Johnson's mother had reported these checks as interest income and he had reported them on his tax return as interest expense. He maintained, however, that the checks were gifts, that they were reported as interest at the mother's insistence and that he obliterated the writing after "FOR" on the checks because it indicated the account on which they were drawn and that was personal to him and not relevant to the citation proceeding.

Respondent testified that after the death of Selma Johnson, Verna Johnson's mother, he had several conversations with Verna concerning her making a will. He stated that she had had prior experience with a land trust in which her uncle was involved and suggested the title to her residence be placed in trust, and that she wanted him to have the home after her death because of their close relationship and all he had done for her and her mother. He told her it could be placed in trust in a joint tenancy and that "this was one method in which she would always have control." The trust agreement provided that in the management of the property the trustee would act only upon the written direction of Verna Johnson.

The only conclusion to be drawn from respondent's testimony is that the decedent was using the joint

tenancies in lieu of a will. It is apparent that no one was present on the occasions when he and Miss Johnson discussed the creation of the joint tenancies, that he took no notes of their discussions, that in the creation of the joint tenancies he was acting as her attorney and that she did not receive independent legal advice. It does not appear that the decedent was present when the documents creating the land trust and the joint tenancy in the savings account were delivered to the trustee and the savings and loan association.

It has long been the rule that "Proof of the relationship of attorney and client, and of the fact that the beneficiary, in whom trust and confidence were reposed by the testator, prepared or procured the preparation of the will by which he profits, raises the presumption that undue influence induced the execution of the will." (*Dial v. Welker, 328 Ill. 56, at 63*.) It is equally well established that when an attorney engages in a transaction with a client during the attorney-client relationship and benefits thereby, in order to show that the benefit he received did not proceed from undue influence, he must prove (1) that he made a full and frank disclosure of all the relevant information that he had, (2) that the consideration was adequate, and (3) that the client had independent advice before completing the transaction. (*McFail v. Braden, 19 Ill.2d 108*.) Whether measured by the test applicable to testamentary dispositions or the rule enunciated in *McFail*, the testimony adduced by respondent falls far short of that which is required to overcome the presumption arising from his relationship with Miss Johnson.

Challenging further the findings of the Commissioners, respondent argues that "there is nothing in the record to justify the charge that he exhibited a lack of candor and honesty and willfully obliterated evidence. The so-called obliterations were disclosed to the Court and the reasons for them, and the Court, in effect, agreed that these were personal records. There is not in this record one word of

censure or question by the Court conducting the proceedings with regard to Mr. Anderson's actions concerning these records."

The transcript of proceedings at the second citation hearing shows that respondent had partially obliterated certain cancelled checks written by him to Verna Johnson and her mother and partially obliterated a letter to him from "Verna and Mom." The originals of these partially obliterated documents were impounded by the court. Thereafter the court entered an order authorizing the administrator to withdraw these documents for the purpose of subjecting them to a scientific examination intended to restore, or ascertain the content of, the obliterated portions. The record does not contain any expert testimony or a report based upon an examination of the obliterated portions of the documents apparently for the reason that the settlement agreement was made shortly thereafter and the citation proceeding was dismissed. Respondent deliberately obliterated portions of documents which the court had ordered him to produce and the seriousness of this action is not diminished by the fact that the court hearing the citation proceeding did not take immediate disciplinary action.

Respondent contends next that in failing to list the savings account held in joint tenancy in the Deerfield Savings and Loan Association on the Form 600, "Application for Inheritance Tax Consents," filed with the Attorney General, he was not attempting to conceal its existence. He testified at the first hearing on the citation proceeding that he did not list the savings account on the Form 600 because he had deposited $5000 into the account in which there was a balance of $5300 at the time of Verna Johnson's death. At the second hearing he shifted his position and stated that he had given $5000 to Verna Johnson and her mother in cash and checks over a period of years. The record shows clearly that although he had knowledge of the account at the time he prepared the

Form 600, he failed to include it therein and subsequently withdrew the funds without informing the financial institution of Miss Johnson's death.

Although the Commissioners made no mention of it, the record shows that this account was originally opened as a certificate account in the names of Verna Johnson and her father and mother. After the death of her father, the account was carried in the names of Verna Johnson and her mother and after the death of her mother the certificate account was transferred into a savings account in Verna Johnson's name alone. On July 10, 1964, ownership of the account was changed to a joint tenancy comprised of Miss Johnson and respondent. On March 12, 1966, respondent withdrew the entire balance and the account was closed. The records of the savings and loan association show that inheritance tax consents were not received at the time of any of these transfers. In the citation hearing respondent testified that he did not obtain a tax consent at the time of the mother's death because the account had been transferred to Verna Johnson prior to the mother's death. The record shows, however, that the transfer to the name of Verna Johnson alone occurred approximately one month after the mother's death. The records of the Deerfield Savings and Loan Association also show that it was not notified of the deaths of the father, the mother or Verna Johnson until the administrator notified it of Verna Johnson's death.

The report of the Commissioners goes into some detail concerning a $6500 withdrawal from the joint savings account on February 13, 1965, and concludes that the respondent's testimony in the citation proceeding was untruthful. The respondent argues that the record does not support this finding.

The following is the pertinent testimony which was given at the third hearing of the citation proceeding:

"Q. What happened between February 13, 1965, at which time the balance was $9,200.00 and September 21, '65 when the balance was $1800.00?

A. I don't know. I didn't have the book.

Q. You did not withdraw that?

A. No.

Q. Did you have any part in any transaction by which any funds were withdrawn from that account?

MR. ANDERSON: Prior to the closing?

Q. During that period.

A. No.

Q. Did you receive any check for any of the proceeds of this account during that period?

A. No.

* * *

Q. This check—was this check in the amount of $6500.00 to Verna C. Johnson?

A. Yes.

Q. Does that bear her endorsement?

A. It does.

Q. Does it bear your endorsement also?

A. Yes, sir.

Q. What happened to that check? That is really my question.

A. Miss Johnson brought it over and asked me if I would sign it. I said 'Do you want to carry that check around when it has been signed?' I said 'actually, it is made out to you, there is no reason for my signing it because you had it.' Well, inasmuch as we were both on the account I explained the facts to her. To satisfy her I signed it and she said then she would go over to the Wheaton Bank and have a cashier's check drawn and I made it, as you notice, payable to the Wheaton Bank and that is the last I know of these funds. I know of no part of it.

Q. You don't know anything that she did with the funds?

A. I don't.

Q. Did she tell you?

A. No, we never discussed it subsequently. She didn't tell me then what she was going to do with it nor did she tell me what she was going to do with any of the other funds that she withdrew from the account."

In an evidentiary deposition taken for use in the disciplinary proceeding, Howard F. Thompson, vice-president and secretary of the Wheaton National Bank, identi-

fied and interpreted certain of the bank's records. Testifying that he had no independent recollection of the transaction, he stated that the bank's records show that a cashier's check made payable to Verna Johnson in the amount of $6500 was presented at his bank by Anderson and used to purchase two cashier's checks. Cashier's check No. 67803 in the amount of $3900.13 was made payable to the order of C. J. Anderson and deposited in the Charles J. Anderson, general trust account. Cashier's check No. 67802 in the amount of $2599.87 was made payable to the District Director of the Internal Revenue Service.

John Surface, in an evidentiary deposition introduced at the disciplinary hearing, testified that he had encountered financial problems in the operation of a plumbing business and that respondent arranged a loan for him in the amount of $6500. He understood that the lender was Miss Johnson and he stated that he signed a promissory note which named her as payee. He received $2599.87 in the form of a check payable to the District Director of Internal Revenue Service which was used to settle a tax liability, and on two later occasions received $3000 and $900 in cash. He testified that he repaid Miss Johnson the sum of $5600 in cash, $2600 on one occasion and $3000 at another time. The records of the Deerfield Savings and Loan Association show a deposit of $2600 to the joint savings account on January 26, 1966, approximately the time that Surface said he had paid Miss Johnson that amount. He testified that he had repaid the balance of $900 to respondent, also in cash. He had no receipts and had destroyed the promissory note.

Whether respondent received the $6500 or whether it was used to make a loan to John Surface which was repaid to Verna Johnson, it is clear that respondent's testimony in the citation proceeding was not truthful.

Challenging another finding of the Commissioners, respondent argues that "his judgment in distributing some

of the personal property of the estate for safe keeping was acquiesced in by the heirs present and the burning of old records was done by them." The record shows that a few days after Miss Johnson's death respondent was present in her home and that Herbert Munson, Sr., who was Miss Johnson's uncle, his wife, and his sister, all of whom had traveled from Muskegon, Michigan, to attend her funeral, were also there at that time. In the citation proceeding respondent testified that he told the Munsons to take the personal property in the house to Muskegon, Michigan, for safe keeping. In evidentiary depositions adduced at the disciplinary proceeding the Munsons testified that respondent told them Munson and his sister were Miss Johnson's heirs and to take what they wanted out of the house; that what they did not take would go to the Salvation Army because the house was going to be put up for sale. They said he told Munson he could buy the decedent's car for its Blue Book value and pay for it from his inheritance. The deposition of Herbert Munson, Jr., is corroborative of his parents' testimony. The record shows that actually Miss Johnson had some 60 heirs. It also reflects that Munson, Sr., and his sister removed two trailer loads and a station wagon full of personalty from Miss Johnson's home, that they subsequently agreed with the administrator that the value of the property taken was $2000 and that $1000 was deducted from each of their distributive shares of the estate.

The Munsons also testified that the respondent took a number of papers from Miss Johnson's safe which he said were records for the preceding five years and told them to burn the rest because they were of no value. The record shows that prior to the death of Selma Johnson, she and Verna had given respondent the combination to their safe. Respondent testified he directed the burning of the decedent's papers because they were old, of no value and too bulky to have around. The burning of these papers is

significant, however, because none of Miss Johnson's recent bank records or records of her transactions with respondent, which were the subject of the citation proceeding, were ever produced. His interests as decedent's lawyer and business advisor, surviving joint tenant and possible debtor were adverse to those of the heirs, and his conduct in causing personal records of the decedent to be burned and her personal property to be removed from the State, when an administrator had not yet been appointed, was most unprofessional.

Respondent argues that there is no proof of any improper motive on his part or of an intent to cheat or defraud, and that failure to exercise good judgment in a given transaction is not grounds for disbarment. The record reflects circumstances which would indicate that Miss Johnson, a spinster with only collateral heirs, might well have wanted respondent to receive her residence and savings account upon her death, but the evidence is irrefutable that he failed utterly to comply with minimum professional standards in his dealings with her. Although the original lapse from proper professional conduct might be explained on the basis of ignorance of the law or poor judgment, his subsequent actions brook neither explanation nor condonation. The record reveals a course of conduct which included obliteration of matters in his personal records, an omission from an application for an Attorney General's consent which could not possibly have been due to oversight, testimony which ranged from reluctance to equivocation to contradiction to falsehood and which covered too long a period of time to be considered a single transaction.

The record shows that respondent is 66 years of age and there is no evidence of prior unprofessional conduct. The preservation of the good reputation of the legal profession and the best interests of the public which it serves require that a lawyer who, whether as the result of

ignorance, carelessness or improper motive, commits a professional impropriety, disclose with candor his role in the matter and that he cooperate in such proceedings as may be necessary to ascertain the facts. This, obviously, respondent failed to do.

The determination of the degree of punishment to be imposed in a disciplinary proceeding is always difficult, and, similar to the sentencing process in a criminal case, must be based upon an evaluation of the evidence, the respondent's past record, his attitude in the disciplinary proceeding, and the best interests of society. Upon consideration of all of these elements, it is adjudged that respondent be suspended for a period of five years.

*Respondent suspended.*

MR. CHIEF JUSTICE UNDERWOOD and MR. JUSTICE SCHAEFER, dissenting in part:

We concur with the majority's statement that: "Although the [respondent's] original lapse from proper professional conduct might be explained on the basis of ignorance of the law or poor judgment, his subsequent actions brook neither explanation nor condonation. The record reveals a course of conduct which included obliteration of matters in his personal records, an omission from an application for an Attorney General's consent which could not possibly have been due to oversight, testimony which ranged from reluctance to equivocation to contradiction to falsehood and which covered too long a period of time to be considered a single transaction."

In our judgment the recommendation of the Board of Governors that respondent be disbarred is appropriate, and we would accept it.