FRANCISCAN SISTERS HEALTH CARE CORPORATION, d/b/a
St. Elizabeth Hospital, Plaintiff-Appellee, *v.* JOHN R. DEAN, Indiv. and as Ex'r
of the Estate of Elizabeth R. Messmer, Deceased, Defendant-Appellant.—(KATE
FISK *et al.*, Defendants.)

Fourth District    No. 16890

Opinion filed December 10, 1981.

TRAPP, J., dissenting.

F. Daniel Welsch, of Young, Welsch, Young & Hall, of Danville, for appellant.

Sebat, Swanson, Banks, Lessen & Garman, of Danville (Hardin W. Hawes and Ralph J. Swanson, of counsel), for appellee.

JUSTICE LONDRIGAN delivered the opinion of the court:
Defendant Dean, a lawyer, drafted what turned out to be Elizabeth Messmer's final will February 7, 1978; after making two small specific bequests Messmer gave the residue of her estate to Dean and St. Elizabeth Hospital, the plaintiff, in equal shares. Messmer died in St. Elizabeth Hospital April 10, 1979, at the age of 97, and the will was later admitted to probate. According to the estate's Illinois inheritance tax return, Messmer died owning property and money worth almost $300,000; schedule E of the return shows that the hospital's and Dean's shares were each worth approximately $130,000. The plaintiff filed this suit to contest the will, alleging that Dean as drafter presumptively had exercised undue influence in obtaining his substantial legacy. The plaintiff sued to invalidate the entire will and not just Dean's legacy (cf. Williams v. Crickman (1980), 81 Ill. 2d 105, 405 N.E.2d 799 (permitting partial invalidation of wills)). Finding that Dean had not overcome the presumption of undue influence, the trial court invalidated the will. Dean appeals this decision, arguing that the trial court misunderstood the effect of the presumption and that his evidence rebutted it and supports the will.

At the outset of the trial the parties agreed that the pleadings admitted the existence of an attorney-client relationship between Dean and Messmer and that the will in question had been typed in Dean's office. The trial court entered orders of default as to the recipients of the two specific bequests, Chapman, who died before the start of the trial, and Castle, and also as to Messmer's heirs. Before hearing testimony the judge declared that the presumption of undue influence was in effect.

Because Dean's appeal focuses on the strength of the evidence adduced at trial, a rather detailed summary of the testimony is necessary; the parties provided a large amount of information regarding Messmer's health during the last several years of her long life and the relationship between Messmer and the Dean family. The plaintiff's first witness was Robert D. Acton, an attorney in Danville who knows Dean. Acton had done legal work for Messmer, including the preparation of two wills, from some time in the 1950s until some time in the 1970s, when he directed her to seek another lawyer because his continued representation

of her posed a conflict of interest with his representation of another client. At some point between 1974 and 1979 Acton received a telephone call from Mrs. Messmer; in response he asked Dean to return to him a key to Messmer's safe deposit box; Dean did not do this. Acton saw Messmer April 3 or 4, 1979, at the Americana Nursing Home in Danville; according to Acton she told him, " 'I want you to arrange to have the Second National Bank look after my affairs. I want out from under the influence of Mr. Dean and want nothing more to do with him.' " Acton then prepared a power of attorney, which Messmer signed, and delivered it to the Second National Bank of Danville. In the nursing home Messmer was hard of hearing but mentally alert; she was strong-willed. Acton said that Messmer had generally looked after her own business affairs. He also said, though, that Messmer had often received advice on business matters from Norman Dale, a local real estate broker, and that Messmer had generally followed Dale's advice. Acton said that "by someone Messmer trusted she was easily influenced." In the two wills that Acton drafted for Messmer he had disposed of the property according to her instructions.

Kathy Omahen, who worked at the nursing home, was in the same room when Acton visited Messmer in April 1979; Omahen had telephoned Acton at Messmer's behest. Omahen confirmed what Acton testified to regarding his visits.

Viola Kersey, a private nurse, was in the nursing home with her patient when Acton stopped by to talk to Messmer. Kersey testified that Messmer told Acton that she wanted him to assume the management of her financial affairs; Acton asked, " 'Are you sure? Mr. Dean has been your business advisor for awhile.' " Messmer said that she was sure, and at that point Kersey left the room. The day when Kersey heard this conversation Messmer appeared disturbed about a recent matter: Mrs. Dean had visited Messmer several days earlier and had been rude to her; they had argued whether Messmer should live at home and pay persons to stay with her. Kersey did not know whether Messmer was still upset about that the day she talked to Acton.

Don Fuller, vice-president, trust officer, and counsel for the Second National Bank of Danville, testified; he identified several exhibits, including a power of attorney signed April 5, 1979, authorizing him to transact certain business matters for Messmer.

Bessie K. Castle had lived across the street from Messmer since 1940 and was to receive a specific bequest under the will involved here. Castle testified that her friendship with Messmer became closer after Messmer's 90th birthday in 1971 or 1972, and that during the last two years Messmer was alive Castle visited her daily. According to Castle, the Dean family began to visit Messmer and dine out with her after Dean wrote a will for her, and these visits continued through the last year of Messmer's life;

Messmer considered Dean a very competent attorney. Mrs. Dean usually was the one to telephone Messmer to invite her out. Castle testified that Messmer had regarded these calls as a nuisance and had generally declined the invitations; even when Messmer accepted them she would make a face as she talked on the telephone. Castle also testified that Messmer's mental and physical condition had remained about the same from 1972 until shortly before her death and described her as intelligent and opinionated. In the early 1970s Messmer did not have any close friends in Danville; one friend lived in Waukegan and another in Rockford. Castle also referred to trips that Messmer and the Deans had taken together during the 1950s. Messmer and the Deans' daughter went to Puerto Rico, and Messmer went to Florida with the entire family. After the 1950s Messmer traveled with others and was "off the Deans." On Messmer's 97th birthday the Deans took a cake to her house. Messmer never spoke to Castle about her wills. The several times that Messmer needed to go to a hospital she went to St. Elizabeth.

The defendant's first witness was Edward Litak, who is an attorney in Danville and has known Dean since about 1950; the two men are acquaintances rather than friends. Litak testified that he spoke to Messmer February 7, 1978, regarding her will. That day Dean went to Litak's office and asked him to witness a will that he, Dean, had drafted and that made him a beneficiary; Litak was immediately aware of the potential ethical problem and therefore was determined to interrogate Messmer longer and more thoroughly than he normally interrogates testators and testatrices. Litak called in his secretary, Julie Hembrey, and explained to her what he intended to do and advised her to listen carefully. Dean took Messmer and the will to Litak's office, introduced Messmer, and then left. For about 15 to 20 minutes Litak questioned Messmer to determine whether the will was voluntary and whether she was aware of the large legacy to Dean. Litak did not, however, discuss with Messmer the size of the legacy beyond referring to it as "substantial." Messmer understood that it was a large amount and explained that she was giving it to Dean because he was her attorney; she also said that she did not have any relatives to leave anything to. Litak repeated his questions but in different forms; he testified that she had the opportunity to reveal any impropriety in the preparation of the will but did not mention anything. Litak's questions concerned whether the will was voluntary, whether Messmer realized that Dean stood to receive a large amount under it, and whether she had been pressured into this. Litak did not read each provision of the will to Messmer; he explained at trial that when he witnesses a will he prefers not to discuss the dispositions because frequently persons do not like to reveal their financial matters to strangers. Thus he did not read the

will to Messmer paragraph by paragraph and did not read it to himself; he did not know that Castle and Chapman were to receive bequests. During the interview Litak handed the will to Messmer for her to read. Litak did not advise Messmer about the tax consequences of the will or the role of an executor—the will named Dean executor. Litak also did not tell her about the ethical problems that arise when a lawyer drafts a will that makes him a beneficiary. Litak did, however, ask Messmer whether she knew that Dean was a beneficiary of the will, and he may have mentioned the hospital too. Although Messmer did not refer to the dispositions of her earlier wills, Litak was left with the impression from his conversations that day with either Messmer or Dean that this was the first of her wills to give anything to Dean.

Litak testified to his belief that "without question [Messmer] was acting freely and voluntarily and intelligently." In his opinion Messmer's mind was strong and she was intelligent and determined; when Litak met her he judged her to be in her early or middle sixties. Litak did not notice whether Messmer was wearing a hearing aid and at trial did not recall that she had had any difficulty hearing. Litak was not paid for interviewing Messmer, although he did receive the customary $25 fee for testifying when the will was admitted to probate. At the conclusion of his interview he, Messmer, and Hembrey each signed the will in the presence of each other. After this Litak spoke only briefly with Dean, handing him the document and saying something to the effect that this was the will that had been executed.

Julie Hembrey also testified for the defendant. Hembrey did not hear Dean's initial conversation with Litak. Hembrey had never seen Messmer before nor did she see her later. According to Hembrey, Litak asked Messmer whether the will was hers, whether she realized that she was leaving something to Dean, and whether she was certain that she wanted to do that; Messmer replied affirmatively to all three questions. Litak read aloud the provision in the will concerning Dean. Litak also asked Messmer whether she had any close relatives or friends, other than Dean, that she wanted to benefit, and she said that she did not. Litak asked Messmer whether she and Dean were friends, and she said that they had been friends for about 20 years and that Dean was her attorney. Litak repeated these questions several times. At trial Hembrey did not recall any reference during the interview to St. Elizabeth Hospital. In Hembrey's opinion Messmer understood the contents of the will and realized what she was doing; Messmer was very alert, appeared to be younger than 90 years old, and did not have any difficulty walking or hearing. Like Litak, Hembrey received no compensation in connection with this except the witness fee given for her testimony in probate court. At trial Hembrey

thought that Litak had referred during the interview to the specific bequests and not just to the provision concerning Dean, yet she did not remember hearing Castle, Chapman, or St. Elizabeth Hospital mentioned.

Dean's daughter, Gwendolyn Fish, and grandaughter, Diana Whitley, also testified in his behalf. Fish and Whitley knew Messmer for about 25 years; Messmer and the Dean family were friends and frequently traveled together; they took their last joint vacation sometime during the 1950s. Throughout the past three decades, and including the last five years of Messmer's life, Messmer and the Deans dined out together, usually about once a month. Their socializing did not increase during the last years of Messmer's life. Messmer gave the Deans gifts; Messmer bought some of these items with the intent to make a gift and bought other items for herself and then decided to give them away when she decided that they were unsuitable for herself. Messmer gave Dean and his granddaughter each a ring. Fish and Whitley visited Messmer in the nursing home about every other week; Dean and his wife visited more frequently. Messmer told Fish and Whitley that she had no relatives.

Dean's and his wife's testimony was presented in an offer of proof; the plaintiff's objection to this was sustained under the Dead Man's Act (Ill. Rev. Stat. 1979, ch. 51, par. 2). Dean does not attack this ruling here.

The plaintiff presented two rebuttal witnesses, Janet O'Rourke and Neils Neilson. O'Rourke lived next door to Messmer for 10 years; O'Rourke did not specify which ten. According to O'Rourke, Messmer was "small and frail" and hard of hearing and could not see well; these problems worsened during the 10 years the two women were neighbors. Because O'Rourke was frequently in her kitchen, where she could see Messmer's yard and driveway, she often saw who was visiting Messmer. Castle went to Messmer's home every day, and Chapman, who mowed the lawn, stopped by almost as frequently. A friend from out of town visited Messmer about once a year. O'Rourke saw Dean there "very occasionally"; he visited more frequently during the last year of Messmer's life. O'Rourke did not remember ever seeing Fish or Whitley next door.

Neils Neilson lived across the street from Messmer for an unspecified length of time. After the death of Messmer's former advisor, Norman Dale, Neilson assumed that role. Several times Neilson's own business matters led him to have business dealings with her. At trial Neilson described Messmer as "an amazing woman up until four or five years ago, I would say"; although she was small and frail, she was strong until that time. Her loss of hearing was "quite advanced," and despite her hearing aid one had to speak to her loudly. Like O'Rourke, Neilson was able to see who visited Messmer; Castle and Chapman were daily visitors; Dean visited, "particularly a year or so before [her] death."

The trial court admitted into evidence previous wills signed by

Messmer; although Dean objected at trial to their admission, he does not dispute that here. Previous wills containing testamentary schemes that conflict with that of the contested will are admissible evidence of growing influence; their use is limited to this purpose. (*Blackhurst v. James* (1922), 304 Ill. 586, 136 N.E. 754; *Kelley v. First State Bank* (1980), 81 Ill. App. 3d 402, 401 N.E.2d 247.) In her immediately preceding will dated September 22, 1975, Messmer gave Dean her safe or vault and all its contents. On March 4, 1976, she executed a codicil to that will, naming Dean executor in place of the Second National Bank of Danville. Messmer's wills of March 10, 1972, and November 25, 1974, do not mention Dean.

On October 16, 1980, the trial judge entered his written order. After summarizing the evidence and discussing the presumption of undue influence he concluded that Dean had not overcome the presumption and declared the will invalid. The judge also said:

"In making this finding, the Court, as fact finder, realizes the evidence would not have been sufficient to upset the will if the presumption was not in existence. The Court, however, recognizes and agrees with the reasoning for the presumption."

Dean does not dispute that the facts here raise the presumption of undue influence. He drafted the will in question and stands to receive a substantial benefit from it; this much is sufficient. (*In re Saladino* (1978), 71 Ill. 2d 263, 375 N.E.2d 102; *Breault v. Feigenholtz* (1973), 54 Ill. 2d 173, 296 N.E.2d 3.) Dean argues that the evidence presented by him rebutted the presumption and that the court's decision is contrary to the manifest weight of the evidence. In his written order the trial judge rejected Dean's contention that the presumption of undue influence is rebutted by producing some evidence to the contrary; the court then quoted the following passage from *Herbolsheimer v. Herbolsheimer* (1977), 46 Ill. App. 3d 563, 566, 361 N.E.2d 134, 136:

"Once the presumption of undue influence has been raised, the burden shifts to the proponents of the will to prove that the influence exerted over the testator was not so great that it overcame the will of the testator."

The trial judge construed this to mean that "the weight of the evidence or preponderance of evidence test would be the obligation of the proponents"; the court also noted that early Illinois cases required clear and convincing evidence to overcome this presumption. The court also said, however, that "the evidence would not have been sufficient to upset the will if the presumption was not in existence." We hold that the trial court misconstrued the role of the presumption and incorrectly shifted onto Dean the burden of persuasion.

Part of this confusion stems from *Herbolsheimer's* statement, quoted above, that when undue influence is presumed "the burden shifts to the

proponents of the will to prove" that the testator's volition was not overborne. In reaching this conclusion *Herbolsheimer* cites generally to *Tidholm v. Tidholm* (1945), 391 Ill. 19, 62 N.E.2d 473; *Tidholm* said, however, that the presumption of undue influence:

> "\* \* \* casts upon the proponent, if he is to sustain the will, the *necessity of showing that the execution of the will was the result of free deliberation on the part of the testator* and of the deliberate exercise of his judgment, and not an imposition or wrong practiced by the trusted beneficiary. [Citations.] This, however, does not change the general rule, which is, that upon the whole case, the burden of proof is upon the contestant to establish undue influence by the whole evidence. [Citation.]" (391 Ill. 19, 25-26, 62 N.E.2d 473, 476-77.)

*In re Saladino* (1978), 71 Ill. 2d 263, 272, 375 N.E.2d 102, 105, an attorney disciplinary proceeding, quoted approvingly a similar statement made in *Dial v. Welker* (1927), 328 Ill. 56, 63, 159 N.E. 286, 289, that evidence raising the presumption of undue influence " 'casts upon the proponents, if the will is to be sustained, the necessity of producing evidence to show that its execution was the result of free deliberation on the part of the testator and of the deliberate exercise of his judgment.' " Thus, in rebutting the presumption of undue influence the proponent's burden is one of production rather than persuasion.

In *Diederich v. Walters* (1976), 65 Ill. 2d 95, 357 N.E.2d 1128, the supreme court reaffirmed its earlier decision in *McElroy v. Force* (1967), 38 Ill. 2d 528, 232 N.E.2d 708, that Illinois follows the Thayer "bursting bubble" theory of presumptions. *McElroy* involved the presumption that the owner of a car is driving it when he is in it; *Diederich* dealt with the presumption that children seven to 14 years of age are incapable of being contributorily negligent. On appeal to the supreme court the plaintiff in *Diederich* argued that the trial court should have instructed the jury on the presumption even though the defendant had presented evidence rebutting it. *Diederich* held that rebutting evidence causes a presumption to evaporate. Once a presumption takes effect, the opposing party has the burden of producing evidence to rebut it:

> "However, once evidence opposing the presumption comes into the case, the presumption ceases to operate, and the issue is determined on the basis of the evidence adduced at trial as if no presumption had ever existed. [Citation.] The burden of proof thus does not shift but remains with the party who initially had the benefit of the presumption." (65 Ill. 2d 95, 100-01, 357 N.E.2d 1128, 1130-31.)

That last sentence must be read narrowly: for "burden of proof" read "burden of persuasion," and the rule is true only when the plaintiff is

claiming the benefit of a presumption: a defendant whose presumption has been rebutted does not then have the burden of disproving the plaintiff's allegations. *Diederich* then cited Wigmore for the proposition that presumptions will dictate a particular result when unrebutted but dissolve when rebutted and Jones for the proposition that the jury ought not to be instructed on a presumption that has been rebutted. Thayer's theory regarding the effect of presumptions, the "prevailing" one, "has generally been followed in Illinois." (65 Ill. 2d 95, 102, 357 N.E.2d 1128, 1131; see also *McElroy*.) *Diederich* distinguished the opposing position, the Pennsylvania or Morgan theory, that presumptions continue in force even after the production of rebutting evidence and form the basis for instructions to the jury.

Thus, Illinois observes an essential difference between presumptions and inferences; some inferences are occasionally incorrectly referred to as "permissive presumptions." (E. Cleary & M. Graham, Handbook of Illinois Evidence §302.2 (3d ed. 1979).) The fact-finder may in its discretion make the inference but in the absence of evidence to the contrary would have to take the presumption; thus, the party urging an inference is not entitled to a directed verdict, but the party urging a presumption is, when no rebuttal evidence is introduced; stated another way, a presumption shifts the burden of production but an inference does not. Furthermore, the rebuttal of a group of facts that gives rise to a presumption and supports an inference will cause the presumption to disappear but will not preclude the fact-finder from drawing the inference. E. Cleary & M. Graham, Handbook of Illinois Evidence §§302.1, 302.2 (3d ed. 1979); McCormick, Evidence §345, at 821 (2d ed. 1972).

*Diederich* and *McElroy* are applicable to all presumptions and therefore govern here; in those opinions the court spoke broadly and did not limit the intended applicability of its rules to the two presumptions at issue.

■■ *Diederich* said only that "evidence opposing the presumption" will rebut it, without elaborating on what that quantum of evidence must be. (*Shaver v. Berrill* (1976), 45 Ill. App. 3d 906, 908, 358 N.E.2d 290, 292.) Consistent with the Thayer approach is the requirement that the opponent of the presumption produce evidence that is "sufficient to support a finding of the non-existence of the presumed fact." (Graham, *Presumptions in Civil Cases in Illinois: Do They Exist?* 1977 S. Ill. U. L.J. 1, 24.) This is also consistent with the language used in other cases involving fiduciaries (*e.g., Zeilenga v. Stelle Industries, Inc.* (1977), 52 Ill. App. 3d 753, 367 N.E.2d 1347) that presumptions of undue influence or fraud or unfairness must be rebutted with "clear and convincing" proof. When fact P is presumed, evidence that will support not-P constitutes clear and convincing proof in rebuttal. A defendant faced with a presumption has

the burden of producing evidence to rebut it, not the burden of persuading the fact finder that facts Q, R, and S exist. The requirement of clear and convincing evidence cannot mean anything more than this. Measured by this standard, Dean's evidence was sufficient to rebut the presumption of undue influence. The key question here is Messmer's state of mind February 7, 1978, the day that she signed the will (*Sterling v. Dubin* (1955), 6 Ill. 2d 64, 72, 126 N.E.2d 718, 723); if she was not under Dean's influence at that time, then her earlier or later feelings toward Dean are irrelevant. Litak and Hembrey provided the only descriptions of Messmer on that day, and they both concluded that Messmer was acting of her own volition in making Dean a substantial beneficiary of her estate. This evidence was sufficient to rebut the presumption of undue influence. Although Litak did not advise Messmer in the sense of drafting another will for her (see, *e.g.*, *In re Estate of Stuhlfauth* (1980), 88 Ill. App. 3d 974, 410 N.E.2d 1063), or in the sense of recommending an alternative disposition in her will or discommending the devise to Dean, he did question her thoroughly. Litak recognized the ethical problem involved here and undertook to determine whether the will represented Messmer's intent and not Dean's. We also note that Messmer was not survived by any close relatives and had few friends. She had known the Deans for years and had traveled with them, given them gifts, and dined with them. All the witnesses agreed that Messmer was determined and knew her own mind; she was alert and in good health. On this basis, then, we conclude that the evidence is sufficient to rebut the presumption of undue influence.

■■■ The inference of undue influence still remains, however, and the force of the inference will vary according to the evidence presented at trial. The statement in *Wunderlich v. Buerger* (1919), 287 Ill. 440, 445, 122 N.E. 827, 829, that "[t]he strength of the presumption [of undue influence] and the amount of proof required to overcome it must depend upon the circumstances of each case" is valid under *Diederich* and Thayer's theory only as a rule of inferences and not of presumptions: a presumption operates until it is rebutted, and when rebutted, it evaporates and has no further effect on the action. What remains is a factual question, and we remand the cause to the trial judge as trier of fact to assess the strength of the evidence.

Dean also argues that the trial court erred in permitting the plaintiff to open and close and in admitting Castle's testimony. Dean argues that because the pleadings admitted the facts necessary to raise the presumption, he should have been allowed to rebut it at the outset of the trial. We find the contrary to be true. Will contests are the products of statute (*Mitchell v. Van Scoyk* (1953), 1 Ill. 2d 160, 167, 115 N.E.2d 226, 230), and the statute provides:

"The contestant shall in the first instance proceed with proof to

establish the invalidity of the will. At the close of the contestant's case, the proponent may present evidence to sustain the will." Ill. Rev. Stat. 1979, ch. 110½, par. 8—1(c).

Dean mildly attacks the admission of Castle's testimony. The will in question here gives Castle $1,000 in cash; the immediately preceding will, dated September 22, 1975, gave her one-half of Messmer's household furnishings, which were worth slightly more than $1,100, according to an affidavit filed as part of her estate's inheritance tax return. Castle's testimony was therefore adverse to her pecuniary interest and admissible. *In re Estate of Shanahan* (1978), 59 Ill. App. 3d 269, 272, 375 N.E.2d 508, 511-12.

Reversed and remanded.

GREEN, P. J., concurs.

Mr. JUSTICE TRAPP, dissenting:

We deal with the fact that an attorney was a major beneficiary under a will which he drafted for his client. I must dissent from the majority opinion in its application of the Thayer hypothesis of the "bursting bubble" in the presumption of undue influence arising under the fiduciary relationship which exists as a matter of law.

It is the conclusion of the opinion that since Dean produced "some evidence" which might be considered to suggest a voluntary choice of the testator, and the plaintiff produced no specific evidence of undue influence in addition to the admitted presumption, the trial court erred in finding the issues for plaintiff. The majority have not sufficiently explored the depths of the Thayer hypothesis.

The annotation in Annot., 5 A.L.R. 3d 19, 39 (1966), quotes the Thayer expansion of the hypothesis as stated in J. Thayer, Evidence App. B, at 575-76 (1898):

"(1) A presumption operates to relieve the party in whose favor it works from going forward in argument or evidence. (2) It serves therefore the purposes of a prima facie case, and in that sense it is, temporarily, the substitute or equivalent for evidence. (3) It serves this purpose until the adversary has gone forward with his evidence. *How much evidence shall be required from the adversary to meet the presumption*, or, as it is variously expressed, to overcome it or destroy it, *is determined by no fixed rule. It may be merely enough to make it reasonable to require the other side to answer*; *it may be enough to make out a full prima facie case*; and *it may be a great weight of evidence*, excluding all reasonable doubt. (4) *A mere presumption involves no rule as to the weight of evidence necessary to meet it.* When a presumption is called a

strong one, like the presumption of legitimacy, it means that it is accompanied by another rule relating to the weight of evidence to be brought in by him against whom it operates." (Emphasis added.)

As so explicated, the "bursting bubble" of Thayer does not provide that "some evidence" in behalf of the proponent is necessarily sufficient to make the presumption valueless.

The position taken here was succinctly stated by Mr. Justice Golden-hersh in *Diederich v. Walters* (1976), 65 Ill. 2d 95, 105, 357 N.E.2d 1128. That opinion concluded that a particular presumption ceased "to operate in the face of contrary evidence * * *." In dissent, it was stated:

"Assuming *arguendo* the correctness of the majority's conclusion the flaw in its treatment of the question is that it has attempted to apply the same rule to all presumptions whereas it is clear from the decisions of this court that all presumptions are not alike." 65 Ill. 2d 95, 105-06, 357 N.E.2d 1128, 1133.

One finds that 1 Gard, Illinois Evidence Manual ch. II (1979) lists some 40 presumptions, in addition to statutory presumptions, which may be considered under the Thayer hypothesis. McCormick, Evidence §343, at 806-07 (2d ed. 1972), states that it is inappropriate "to attempt to list the hundreds of recognized presumptions, * * *."

McCormick states the nature, quality, and purpose for the creation of presumptions:

"A presumption shifts the burden of producing evidence, and as we shall see, under the preferable view operates to assign the burden of persuasion as well. Therefore naturally, the reasons for creating particular presumptions are similar to the considerations, which have already been discussed, that bear upon initial or tentative assignment of those burdens. Thus, just as the burdens of proof are sometimes allocated for reasons of fairness, some presumptions are created to correct an imbalance resulting from one party's superior access to the proof. * * *. Similarly, notions, usually implicit rather than expressed, of social and economic policy incline the courts to favor one contention by giving it the benefit of a presumption, and correspondingly to handicap the disfavored adversary."

In discussing the "bursting bubble" theory of the Thayer hypothesis, it is stated in McCormick:

"As has been discussed, presumptions are frequently created in instances in which the basic facts raise a natural inference of the presumed fact. This natural inference may be sufficient to take the case to the jury, * * * despite the resultant destruction of the presumption. * * *." McCormick, Evidence §345, at 821 (2d ed. 1972).

The text continues:

"Presumptions, as we have seen, have been created for policy reasons that are similar to and just as strong as those that govern the allocation of the burdens of proof prior to the introduction of evidence. These policy considerations generally persist despite the existence of proof rebutting the presumed fact. They may be completely frustrated by the Thayer rule when the basic facts of the presumption do not give rise to an inference that is naturally sufficient to take the case to the jury." McCormick, Evidence, §345 at 822 (2d ed. 1972).

The majority opinion cites controlling authority upon the established policy of the courts where a fiduciary relationship exists and a presumption of undue influence is created, *i.e.*, the fiduciary is required to show that the execution of the will:

"[W]as the result of free deliberation on the part of the testator and of the deliberate exercise of his judgment, and not an imposition or wrong practiced by the trusted beneficiary." *Tidholm v. Tidholm* (1945), 391 Ill. 19, 25-26, 62 N.E.2d 473, 476.

Happily, relatively few will contests include an issue where the testator's attorney drafts a will wherein he is a beneficiary. However, instances are found in attorney disciplinary proceedings. It may be argued that in a narrow sense, attorney disciplinary proceedings include factors not necessarily concerned in the decision here, *i.e.*, "an obligation to avoid even the appearance of impropriety."

In *In re Saladino* (1978), 71 Ill. 2d 263, 272, 375 N.E.2d 102, 105, the supreme court agreed with the finding "that the evidence is not clear and convincing that respondent was actually carrying out complainant's wishes." That language is cited with approval in *In re Barrick* (1981), 87 Ill. 2d 233. In *Barrick*, the attorney drafted a will wherein the testator left to him a legacy from a substantial estate. The legacy was computed as the equivalent of his retainer fee for a period of five years. In a disciplinary proceeding, the supreme court found that although undue influence might have been presumed "the evidence *established* that there was none." (Emphasis supplied.) (87 Ill. 2d 233, 241.) Among the items of evidence noted was that the testimony showed that the attorney had emphasized his conflict of interest to the testator and pressed the testator to obtain other counsel to the point that the testator was offended and adamant. There was substantial evidence that the testator had received independent advice (*Saladino*; *In re Anderson* (1972), 52 Ill. 2d 202, 287 N.E.2d 682.) *Barrick* states that while the act of the attorney in drafting such a will may be proper in special circumstances "he should be prepared to prove later what really happened." 87 Ill. 2d 233, 239.

Upon the conclusion that the Thayer hypothesis does not undertake

to specify what quantum of evidence is required to rebut the presumption of undue influence, one finds that the cases cited as to both will contests and disciplinary proceedings establish a standard of evidence to rebut the presumption of undue influence which is much greater than the "some evidence" which is deemed sufficient in the conclusions of the majority. The standard of clear and convincing evidence found in the disciplinary proceedings is consistent with, and the equivalent of, the standard of *Tidholm* cited in the majority opinion as the "necessity of showing that the execution of the will was the result of free deliberation * * * and of the deliberate exercise of his judgment * * *." (*Tidholm v. Tidholm* (1945), 391 Ill. 19, 25-26, 62 N.E.2d 473, 476.) One may fairly conclude that notwithstanding the Thayer hypothesis, the supreme court has established that in cases of this character the proponent has the burden of persuasion, and that the rationale of the majority opinion is clearly inconsistent with the standard of proof required under these facts.

The evidence presented in support of this will clearly fails to rebut the presumption of undue influence arising from the attorney-client relation. An absence of close relatives is hardly proof that the bequest to Dean was a product of the testator's free and voluntary determination. Again, evidence that Dean and testator went to dinner once a month, or had in years past joined in vacation trips, is hardly persuasive evidence upon that significant issue. Such facts may equally be interpreted as a program to enlarge Dean's influence.

Testator's interview with Mr. Litak prior to the execution of the will cannot fairly be called independent advice. Conceding that Litak made a conscientious effort to cope with an apparently unexpected, unclear, and embarrassing circumstance, one finds that testator was simply introduced by Dean and delivered to Litak to execute the will. Although Dean did not preside at the execution in a literal sense, he not only drafted the will, but procured its execution before strangers to the testator. It does not appear that Litak knew the contents of the will, or that he was in any way aware of the circumstances under which Dean became a major beneficiary. There is no basis to necessarily conclude that the testator would immediately disclose doubts or fears to the strangers introduced to her some 20 minutes before the signing of the will.

The majority opinion emphasizes the language of the trial court concerning reliance upon the presumption to reach his decision. The statement is not remarkably significant for the reason that the plaintiff had no access to information concerning the substance and background of the transaction between the testator and Dean. The circumstances of the making of the will in this case are precisely the reason for which the presumption was created as a matter of policy. The quoted sentence of the trial court may fairly be interpreted to mean that the presumption of undue influence was not rebutted, and I would affirm.