In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1969

SUSAN BALL, et al.,

*Plaintiffs-Appellants*,

*v.*

CHERIE KOTTER, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cv-01613—**Robert M. Dow, Jr.,** *Judge.*

ARGUED JANUARY 16, 2013—DECIDED JULY 23, 2013

Before BAUER and HAMILTON, *Circuit Judges*, and MILLER, *District Judge*.[*]

BAUER, *Circuit Judge*. This movie-script-like case features three main characters: Donald C. Hedstrom, a now-deceased, ex-husband buyer; Cherie Kotter, an ex-wife real

---

[*] The Honorable Robert L. Miller, Jr., District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

estate agent; and Hope Geldes, the decedent's real estate attorney. The action begins with Hedstrom's desire to purchase two condominium units in Chicago's Lake Point Tower. He retained the services of Kotter and Geldes to make that happen. After a series of events, Hedstrom eventually purchased the desired units—one unit was titled to Hedstrom and Kotter as joint tenants with rights of survivorship; the second to the Kotter Family Trust. Shortly thereafter, Hedstrom died, and in accordance with the first unit's title, Kotter became the sole owner of the property.

Other characters in the script, Susan L. Ball and Jan K. Witteried, two of Hedstrom's children—the administrators of Hedstrom's estate (the Administrators)—were displeased with this result. Believing that the units were not titled in accordance with Hedstrom's desires, they filed a two-count lawsuit against Kotter[1] and Geldes seeking to recoup the fees and commissions Kotter and Geldes earned in the transactions, as well as receive compensation equal to the combined market value of the two properties or, alternatively, a judgment transferring title of the units to Hedstrom's estate. The count against Kotter was for breach of fiduciary duty, which arose out of the interest she received in the two condo units. The other count was against Geldes for legal malpractice, alleging that she failed to recognize certain conflicts of interest in the two transactions.

---

[1] The lawsuit names Kotter, individually, and the Kotter Family Trust. We refer to the parties collectively as "Kotter."

Kotter and Geldes moved for summary judgment after discovery. The Administrators did the same. The district court granted summary judgment in favor of Geldes because expert testimony was needed to delineate the standard of care required of her, and the Administrators were barred from presenting the required testimony. The district court initially denied Kotter's motion but later granted summary judgment in favor of her as well, concluding that the undisputed evidence demonstrated the units were titled in accordance with Hedstrom's intent and Kotter did not breach her fiduciary duty to Hedstrom. The Administrators appeal both decisions. We affirm.

## I.  BACKGROUND

### A.  Underlying Facts

A brief synopsis of the parties' underlying relationship is necessary to understand the storyline of this case. Ball and Witteried are two of Hedstrom's children from his first marriage. In 1998, Hedstrom married Kotter, a licensed real estate agent in the State of Illinois. Their marriage lasted "about two years." Nonetheless, Hedstrom and Kotter were on good terms at the time of Hedstrom's death, and Hedstrom went so far as to refer to Kotter as his "good friend and companion" in his will and living trust. Additionally, there is no evidence that Hedstrom lacked mental capacity or had impaired mental capacity at any time during the events at issue.

We fast forward to July 2006; that is when the events in question really began.

Hedstrom decided to purchase two condominium units in Chicago's Lake Point Tower. (One condo is "Unit 4705"; the second is "Unit 1518." We refer to each condo by its respective unit number and the two units collectively as "the Units.") To make his desire a reality, Hedstrom needed assistance. He reached out to Kotter to act as his real estate agent for the purchase of the Units. He also reached out to Geldes to be his real estate attorney. Kotter and Geldes had never before worked together on a real estate transaction.

On July 26, 2006, Geldes sent Hedstrom two retention letters that corresponded with each of the two Units. Geldes did not send the letters directly to Kotter. Each letter required a signature of acceptance from Hedstrom. Hedstrom signed each of these letters on July 30, which confirmed his acceptance of the terms of Geldes' representation, and he sent them back to Geldes.

On the morning of July 26, Kotter sent Geldes an email that said, in part, "[Hedstrom] is taking title in another name. He will let me know the proper way to prepare the deed. [ . . . ] Don cannot hear over a phone so I will be answering all questions for him." Kotter also told Geldes around that time that Hedstrom would be unavailable "until the end of the week of August 1, 2006," because of surgery.

On July 31, Geldes sent letters regarding each of the Units to the attorneys for the sellers of the Units. In each letter, Geldes wrote, "At closing, title for Unit shall be

conveyed by warranty deed to Mr. Donald Hedstrom." Hedstrom and Kotter were copied on the letters via email. In response, Hedstrom emailed the following message to Geldes that evening:

> For the last time, I'm going to repeat that there is to be NO mortgage on units 1518 and 4705 that I am purchasing in Lake Point Tower. I have made arrangements to have the required funds available at the day of closing or before. Also I have written in at least 4 documents that these 2 properties will be jointly owned by Cherie Kotter and me and you have copies of these. Please comply or I will have to get another attorney.

The next morning, on August 1, Geldes responded to Hedstrom's email. She wrote, in part,

> Please allow me to explain my letter. . . . Cherie had asked me to discuss with you both, whether you wanted to own it as joint tenants with right of survivorship, tenants in common or set up a living trust. . . . The seller's attorney will not be preparing the deeds until the end of the week. We can change title at any time.

Kotter was copied on the email, and about thirty minutes later, she responded. Kotter wrote, "Regarding 4705 [. . . .] Please put deed to that unit in the names Don C. Hedstrom and Chrie [sic] S Kotter as joint tenants with rights of survivorship[.]" This email was not sent to Hedstrom.

  Looking specifically to Unit 4705: later that day, on August 1, Geldes sent a revised modification letter to

the attorney for the seller of Unit 4705 in response to the instructions she received from Kotter. The letter stated in pertinent part, "At closing, title for Unit shall be conveyed by warranty deed to **Mr. Donald C. Hedstrom and Ms. Cherie S. Kotter, as joint tenants with right of survivorship**." (emphasis in original). Geldes sent the letter to the other attorney via facsimile and U.S. mail. Hedstrom and Kotter were copied via email.

Geldes testified that she spoke to Hedstrom on the telephone shortly after sending the revised letter. According to Geldes, she explained to Hedstrom the legal implications corresponding to the different manners in which the Units could be titled. Also according to Geldes, Hedstrom explicitly told her that he "wanted to take the Properties jointly with rights of survivorship because he wanted to take care of Cherie Kotter and ensure that the Properties would pass to Kotter upon his death as he was leaving several other properties he owned to his children." Hedstrom's will and living trust confirmed that Hedstrom left other properties to his children.

On August 4, 2006, Unit 4705's seller assented to the modifications in the August 1 letter. The closing for Unit 4705 was held on August 14, 2006. Hedstrom, Kotter, and Geldes all attended it. The deed prepared listed the "Grantee" as "Donald C. Hedstrom and Cherie S. Kotter." The deed included four possible options as to how the Unit could be titled: as tenants in common; not as tenants in common but as joint tenants; not as tenants in common nor joint tenants, but as tenancy by the

entirety; statutory-fee simple. Above the four options was "Strike Inapplicable." The record indicates that, at the closing, Kotter and Hedstrom watched as Geldes drew lines through the options "as tenants in common," "not as tenants in common nor joint tenants; but as tenancy by the entirety," and "statutory-fee simple." They also watched as Geldes handwrote the phrase "with right of survivorship" after the phrase "not tenants in common but as joint tenants." Geldes testified that she explained to Hedstrom and Kotter that she "was making sure that the deed reflected Mr. Hedstrom's wish that the property be titled to Mr. Hedstrom and Ms. Kotter jointly with rights of survivorship, as Mr. Hedstrom had previously requested on the phone," when she made the changes. Geldes also testified that Hedstrom verbally assented to each handwritten change she made to the document.

The deed to Unit 4705 was properly recorded; it identified that the title was held by Hedstrom and Kotter jointly, with rights of survivorship.

The titling history for Unit 1518 is significantly more complex: on August 4, 2006, Geldes sent an attorney modification letter to the attorney for the seller of Unit 1518. She wrote, "At closing, title for Unit shall be conveyed by warranty deed to Mr. Donald Hedstrom and Cherie S. Kotter, as joint tenants with right of survivorship." Geldes sent the letter to the attorney via facsimile and U.S. mail. Hedstrom and Kotter were again copied via email.

Before the closing, Kotter sent Geldes an email in the afternoon on September 13. Hedstrom was not included

on the email. Kotter wrote, "Please have the deed [for Unit 1518] made out to the Kotter Family Trust dated Sept. 25th 1993." This was not in accordance with the modification letter Geldes sent on August 4; Kotter is the sole trustee and sole settlor of the Kotter Family Trust. Kotter also orally told Geldes that Hedstrom would not be present at the closing for Unit 1518 and that Geldes would need to draft a document giving Kotter power of attorney (POA) and assigning Hedstrom's rights to Unit 1518 to the Kotter Family Trust.

The next morning, on September 14, Geldes replied to Kotter's September 13 email. She wrote, "I have a call into the title company regarding the POA and the assignment from [Hedstrom] to the Kotter Family Trust."

Geldes stated in her affidavit that she drafted a POA in accordance with Kotter's request. The POA provided the following:

> Such power shall include but is not limited to deliverance of any money and negotiating any terms relative to the purchase of said property, **assigning said property to the Kotter Family Trust dated September 25, 1993 and settlement statements,** and giving and granting unto **Hope F. Geldes,** said ATTORNEY, full power and authority to do and perform all and every act and thing whatsoever . . . . (emphasis in original).

Geldes stated that she called Hedstrom to confirm the changes. Hedstrom did not answer the call, but Geldes attests that she left him a voicemail. Hedstrom never called Geldes back.

On the morning of September 18, Geldes sent an email to both Hedstrom and Kotter. The email provided as follows:

> Don and Cherie, I have attached the power of attorney for Don to sign and have a witness sign it and have it signed by a notary. The original must be brought to closing. The power of attorney assigns the rights under the contract to the Kotter Family Trust. The Kotter Family Trust will own the property not Don and Cherie as joint tenants. If you have any questions, please call me. I have also faxed a copy of the power of attorney to Don's work.

Attached to the email was the POA Geldes prepared.

Hedstrom executed a POA before a witness and notary republic that same day. He then faxed it back to Geldes. The parties do not dispute that the signature on the POA is Hedstrom's. However, the POA executed substituted "**Cherie Kotter**" for where "**Hope F. Geldes**" had previously been written.

The closing for Unit 1518 was held on September 18, 2006. Kotter and Geldes attended the closing; Hedstrom did not. Unit 1518 was titled to the Kotter Family Trust. The deed was properly recorded.

Kotter received a real estate brokerage commission for the purchase of the two Units. She contends the commissions were used to buy furniture for and remodel the Units.

On November 15, 2006, Hedstrom executed a final will and living trust. These were prepared by a different

attorney. The will stated in part, "My condominium located at Unit No. 4705, Lake Point Towers, 505 North Lake Shore Drive, Chicago, Illinois 60611, shall be sold by either my Personal Representative or the Trustee under the Living Trust which I restated this date concurrently with the execution of this Will." Language in the trust closely-tracked the will: "My condominium located at Unit No. 4705, Lake Point Towers, 505 North Lake Shore Drive, Chicago, Illinois 60611 shall be sold by my Trustee. The proceeds from the sale of my Chicago condominium shall pass to the residue of the trust estate in accordance with the next paragraph of this Instrument." Unit 1518 is not referred to in Hedstrom's will, living trust, or any other estate-planning documents. No party asserts that the will or living trust are invalid in any way.

Hedstrom died on January 20, 2007. His will and living trust were followed; Ball and Witteried were appointed Administrators of Hedstrom's estate on April 11, 2007. Title to Unit 4705 vested fully in Kotter pursuant to the "right of survivorship" provision.[2] Unit 1518 remained titled to the Kotter Family Trust.

## B. Procedural Posture

The Administrators discovered how the Units were titled when Hedstrom's will was probated. Believing

---

[2] Kotter transferred title of Unit 4705 to Larry Peckler on October 5, 2007.

that the Units were not titled in accordance with Hedstrom's wishes, the Administrators filed suit against Kotter and Geldes on March 19, 2008. Count I is against Kotter, alleging breach of fiduciary duty by a real estate agent. The Administrators claim Kotter did not represent the interests of Hedstrom above her own personal interests. Count II is against Geldes, alleging legal malpractice; the Administrators claim that Geldes did not adequately represent Hedstrom's interests during the purchasing of the Units and that she inappropriately represented two parties—Hedstrom and Kotter—with competing interests.

The case proceeded to discovery before the magistrate judge. The Administrators were required by January 30, 2009, to disclose the names of any experts regarding the standard of care and duties owed to Hedstrom. The Administrators did not name any expert by the deadline.

On August 12, 2009, the magistrate judge issued an order that barred the Administrators from presenting any expert testimony on the relevant issues. This included expert testimony encompassing Kotter's position as a real estate agent and Geldes' position as a real estate attorney. The district judge affirmed the magistrate judge's order on November 12, 2009, foreclosing the Administrators from presenting expert testimony. *See Ball v. Kotter*, No. 08-cv-1613, 2009 U.S. Dist. LEXIS 106210 (N.D. Ill. Nov. 12, 2009). These decisions have not been appealed.

On May 15, 2009, Geldes filed a motion for summary judgment, contending that the Administrator's failure

to present expert testimony entitled her to summary judgment in her favor on the legal malpractice claim; Kotter filed a similar motion on May 19. The Administrators filed cross-motions for summary judgment.

The district judge issued an order on October 18, 2010, which encompassed many issues. *See Ball v. Kotter*, 746 F. Supp. 2d 940 (N.D. Ill. 2010). The first issue was the application of the Illinois Dead Man's Act. *See* 735 Ill. Comp. Stat 5/8-201. The statute provides in relevant part:

> In the trial of any action in which any party sues or defends as the representative of a deceased person or person under a legal disability, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability . . . .

As the district court noted, "The purposes of the Act are to protect decedents' estates from fraudulent claims and to equalize the position of the parties in regard to the giving of testimony." *Gunn v. Sobucki*, 837 N.E.2d 865, 869 (Ill. 2005). We need not provide an expansive discussion of the Act, though we recognize that it is at play in this case. *See, e.g.*, *Lovejoy Electronics, Inc. v. O'Berto*, 873 F.2d 1001, 1005 (7th Cir. 1989). But nonetheless, the district court determined that Kotter and Geldes were prohibited from "introduc[ing] evidence of their conversations with Hedstrom or events at which Hedstrom was present unless and until [the Administrators]

introduce[d] testimony concerning the same conversation or event." *Ball*, 746 F. Supp. 2d at 948.

The district court proceeded to Geldes' motion for summary judgment. In granting summary judgment in favor of Geldes, the court discussed the Administrators' claims against Geldes and determined that expert testimony was needed to establish the appropriate standard of care. The Administrators were prohibited from offering such testimony, so the court entered judgment in favor of Geldes. The court denied the Administrators' cross-motion against Geldes.

The district court next addressed Kotter's motion for summary judgment. Kotter argued that the Administrators' inability to present expert testimony as to the standard of care was fatal to the count against her as well. The court rejected this assertion because expert testimony is not necessary to establish breach of a fiduciary—"[B]ecause Kotter was Hedstrom's fiduciary and did benefit from the transactions, the law *presumes* that she defrauded her principal. *See, e.g., Kirkruff v. Wisegarver*, 697 N.E.2d 406, 411 (Ill. App. Ct. 4th Dist. 1998)." *Ball*, 746 F. Supp. 2d at 955-56 (emphasis in original). The district court then denied both cross-motions for summary judgment regarding Kotter because there were "unresolved factual disputes."

Kotter and the Administrators filed cross-motions for reconsideration of the district court's October 18, 2010 order and renewed motions for summary judgment. The basis for the motions was the court's failure to address how the granting of summary judgment in favor of

Geldes—and her removal from the case as an interested party—affected the admissibility of her testimony under the Act as it related to the claim against Kotter. Kotter contended that Geldes could now testify regarding conversations she had with Hedstrom that were previously prohibited. Kotter also argued, first, that her position did not affect how the Units were titled, so she could not benefit from the deals by virtue of her fiduciary status; and second, that the presumption of donative intent cancelled out the presumption of fraud.

The district court granted Kotter's motion for summary judgment on March 22, 2012. *See Ball v. Kotter*, No. 08-cv-1613, 2012 U.S. Dist. LEXIS 38739 (N.D. Ill. Mar. 22, 2012). In doing so, the court ruled that, because Geldes was no longer a party to the case, her testimony could properly be admitted and used to defeat the Administrators' claim against Kotter. Accordingly, the court considered the following additional information in ruling on the motions:[3]

- Geldes testified that at some point after she sent to the seller's attorney, Kotter, and Hedstrom the modification letter that indicated that unit 4705 would be conveyed to Hedstrom and Kotter as joint tenants with right of survivorship, Geldes had a conversation with Hedstrom directly, in which

---

[3] The parties do not take issue with the district court's rulings under the Illinois Dead Man's Act, and we have, therefore, limited our discussion of the facts to those not prohibited by the Act.

she explained the possible title options for the two units and the legal implications of each.

- According to Geldes, during this conversation, Hedstrom told Geldes that he wanted both units titled with Kotter and Hedstrom as joint tenants, with a right of survivorship.

- Hedstrom told Geldes that he wanted the units titled in this way because he wanted to take care of Kotter and he wanted to ensure that the two units would pass to Kotter upon his death as he was leaving several other properties he owned to his children.

- Geldes testified that at the closing for unit 4705, she made the changes to the deed in front of Kotter and Hedstrom, and that Hedstrom verbally assented to the handwritten changes as they were being made.

*Id.* at *26-27.

The district court moved to the merits and concluded that the presumption of fraud applied because Kotter "benefitted from the two transactions in which she served as a fiduciary." The court rejected Kotter's contention that the presumption of donative intent overrode or cancelled out the presumption of fraud. Next, the court ruled that Kotter needed to demonstrate by "clear and convincing" evidence that she exercised good faith and did not betray Hedstrom's confidence. And referencing Geldes' testimony that was now admissible, the court concluded that Kotter did in fact rebut the

presumption. Finally, the court concluded that, with the presumption gone, the undisputed testimony showed that the Units were titled in accordance with Hedstrom's wishes and that Hedstrom understood the consequences of the titling of each Unit. The district court, therefore, granted summary judgment in favor of Kotter because no reasonable juror could find in favor of the Administrators on their breach of fiduciary count. The Administrators' motion for reconsideration and renewed cross-motion for summary judgment were denied.

## II. DISCUSSION

The Administrators contend the district court improperly granted summary judgment in favor of Geldes on their legal malpractice claim and in favor of Kotter on their breach of fiduciary claim. We review the district court's grant of summary judgment *de novo. Fail-Safe, LLC v. A.O. Smith Corp.*, 674 F.3d 889, 892 (7th Cir. 2012). In doing so, we view all facts and draw all inferences in the light most favorable to the non-moving party. *Shaffer v. Am. Med. Assoc.*, 662 F.3d 439, 442 (7th Cir. 2011). Summary judgment is appropriate here if, on the evidence provided, no reasonable juror could return a verdict in favor of the Administrators. *See Carlisle v. Deere & Co.*, 576 F.3d 649, 653 (7th Cir. 2009). Additionally, like the district court, we will apply Illinois law to the substantive issues. *See Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010) (explaining that state law applies to substantive issues when federal court jurisdiction is

premised on diversity and that the court applies the law of the state in which it sits when neither party raises a conflict of law issue). We address each of the Administrators' arguments in turn.

### A.  Legal Malpractice Claim Against Geldes

We begin with the district court's grant of summary judgment in favor of Geldes on the Administrators' legal malpractice claim. A plaintiff must prove five elements in an action for legal malpractice in Illinois: "(1) an attorney-client relationship; (2) a duty arising out of that relationship; (3) a breach of that duty; (4) causation; and (5) actual damages." *Wash. Group Int'l, Inc. v. Bell, Boyd & Lloyd, LLC*, 383 F.3d 633, 636 (7th Cir. 2004) (quoting *Griffin v. Goldenhersh*, 752 N.E.2d 1232, 1238 (Ill. App. Ct. 5th Dist. 2001)). Plaintiffs are generally required to present expert testimony to prove their claim, and a failure to do so may prove fatal. *Barth v. Reagan*, 564 N.E.2d 1196, 1200 (Ill. 1990). Illinois courts, however, have carved out a niche from this general requirement, known as the "common knowledge rule." *See, e.g.*, *House v. Maddux*, 360 N.E.2d 580, 584 (Ill. App. Ct. 1st Dist. 1977). Under the common knowledge rule, expert testimony is not required "[w]here no issue is raised as to defendant's responsibility for allowing the statute of limitations to run, where the negligence of defendant is apparent and undisputed, and where the record discloses obvious and explicit carelessness in defendant's failure to meet the duty of care owed by him to plaintiff[.]" *Brainerd v. Kates*, 386 N.E.2d 586,

589 (Ill. App. Ct. 1st Dist. 1979) (quoting *House*, 360 N.E.2d at 584). In other words, no expert testimony is needed "where the professional's conduct is so grossly negligent . . . that a layperson could readily appraise it[.]" *Advincula v. United Blood Servs.*, 678 N.E.2d 1009, 1021 (Ill. 1996).

The magistrate judge barred the Administrators from offering expert testimony on the standard of care owed by Geldes to Hedstrom, and the district judge concluded that decision was neither clearly erroneous nor contrary to law. Because those determinations were not appealed to us, the main issue here is whether the information presented and the allegations against Geldes show "such obvious and explicit carelessness" by Geldes as to repudiate the requirement that the Administrators present expert testimony. In short, if the common knowledge rule does not apply, the Administrators lose.

Looking to the allegations against Geldes, the Administrators contend Geldes should have recognized the conflict of interest between Hedstrom, the principal, and Kotter, who was acting as an agent for Hedstrom but also benefitting from the transaction. In the Administrators' eyes, "when a real estate attorney is confronted with a transaction that is presumptively fraudulent as [a] matter of law," the duty of care required by an attorney is obvious. The Administrators also vaguely reference two additional contentions made in the district court regarding Geldes' alleged malpractice: (1) Geldes represented Hedstrom and Kotter

in the purchase of the Units, and she failed to disclose or resolve the conflict; and (2) Geldes failed to disclose and explain to Hedstrom the legal effect of Kotter's direction regarding how title to the Units would be held. But because these allegations also relate to Geldes' duty of care and obligation to properly communicate with Hedstrom, regardless of how they are phrased, we address them collectively.

Our task is to determine whether the standard of care underlying the allegations in this case is obvious or apparent. No argument has been put forth that an attorney-client relationship did not exist between Hedstrom and Geldes, so the Illinois Rules of Professional Conduct and the affirmative obligations required under them and Illinois case law are relevant to the standard of care. *See Owens v. McDermott*, 736 N.E.2d 145, 157 (Ill. App. Ct. 1st Dist. 2000) (explaining that the rules of professional conduct and the rules of legal ethics are relevant to the standard of care in a legal malpractice suit (citing *Nagy v. Beckley*, 578 N.E.2d 1134, 1136-37 (Ill. App. Ct. 1st Dist. 1991))). The Rules, however, "do not establish a separate duty or cause of action," and they are "not an independent font of liability." *Id.* We agree that the Rules provide that a "lawyer has [an] affirmative duty to take necessary steps to keep [a] client informed about his case so [the] client can make intelligent choices as to [the] direction of litigation, as well as to respond to client questions and demands for information promptly," as the Administrators explain, citing *In re Smith*, 659 N.E.2d 896, 902 (Ill. 1995). *See Rogers v. Robson, Masters, Ryan, Brumund & Belom*,

407 N.E.2d 47, 48-49 (Ill. 1980). But a violation of the Rules in and of itself does not establish liability in a legal malpractice case, and there is a difference between having a "duty" to do something under the Rules and determining just what that "something"—i.e., the standard of care—encompasses. *Compare Duty*, BLACK'S LAW DICTIONARY 543 (8th ed. 2004) ("A legal obligation that is owed or due to another that needs to be satisfied; an obligation for which somebody else has a corresponding right."), *with Jones v. Chi. HMO Ltd. of Ill.*, 730 N.E.2d 1119, 1129-30 (Ill. 2000) ("What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty." (quoting W. Prosser, Torts, at 324 (4th ed. 1971) (emphasis omitted))).

*Barth v. Reagan* is instructive here. The plaintiff in *Barth* argued that "the basic duty of an attorney to communicate with a client" should fall within the common knowledge rule because a lay person would understand an attorney's "total lack of communication" with a client. *Barth*, 564 N.E.2d at 1200. The Illinois Supreme Court held otherwise, concluding that the attorney's duty to communicate naturally depended on the parties' relationship and the particular facts of the case, which involved "intricacies" that were beyond the purview of lay persons. *Id.* at 1200-01 ("'Conflicting interest' is the simultaneous adverse representation of multiple clients. We view the concerns an attorney has regarding his or her professional responsibilities in this area as being complex, and we do not find the intricacies of this type

of representation to be within the common knowledge of lay persons." (internal citations omitted)).

Accordingly, what is required to satisfy a more complex "duty"—one based on a professional's *skill*—is different than when an attorney misses a deadline, fails to comply with a statute of limitations, or completely neglects to take any action regarding a case. *See id.* at 1201 (citing *Gray v. Hallett*, 525 N.E.2d 89, 91-92 (Ill. App. Ct. 5th Dist. 1998); *Sorenson v. Fio Rito*, 413 N.E.2d 47, 49-50, 53 (Ill. App. Ct. 1st Dist. 1980); *House*, 360 N.E.2d at 584). A lay juror need not be "skilled in the profession" to understand when an attorney has made one of the aforementioned obvious blunders; thus, expert testimony on the standard of care is unnecessary in those types of cases. *See id.* The same goes for a medical malpractice case, for example, when a surgical instrument is left in a patient's body, *Walker v. Rumer*, 381 N.E.2d 689, 691 (Ill. 1978), or when a plaintiff alleged that he was "restrained on a bed and left alone in a hospital emergency room to be exposed to an ignition source that set[] him on fire[.]" *Heastie v. Roberts*, 877 N.E.2d 1064, 1076-77 (Ill. 2007). Some negligence is obvious; other types are not. Communicating with clients and recognizing conflicts of interest in a legal transaction do not fit within these "obvious" examples or the purview of a lay juror.

The Administrators maintain that the duty Geldes owed to Hedstrom is "clearly delineated," but they fail to explicitly opine on what was required to satisfy Geldes' duty, aside from "recognize the conflict of interest." If the

Administrators are unable to provide us with the scope of Geldes' duty, then the standard of care required surely cannot be within the common knowledge of a lay juror. For example, again comparing this case to a medical malpractice action, a plaintiff can allege that a doctor has a duty to not "exceed a plaintiff's scope of consent," but an expert is required to opine as to the extent of consent given. *See Holzrichter v. Yorath*, 987 N.E.2d 1, 2013 IL App. (1st) 110287, ¶88 (Ill. App. Ct. 1st Dist. Mar. 4, 2013) ("[W]hether [the defendant-doctor] exceeded the parameters of the surgery to which the plaintiff consented is beyond the ken of a layperson, and it requires a medical expert to opine on whether cutting tendons is part and parcel of the Z scarf osteotomy procedure.").

Here, looking to the "duty of care," it would not be readily apparent to a lay juror as to (1) whom Geldes was required to communicate with; (2) the type of communication required (e.g., letter, email, phone, in-person); (3) how often Geldes was required to communicate; (4) what specific information Geldes was required to communicate; (5) and what steps Geldes was required to take in response to the information and issues presented in this particular situation. Expert testimony was needed to establish the answers to questions like these, which would in turn form the basis of the applicable standard of care. Only then could the Administrators attempt to prove the other elements required in a legal malpractice case: breach, causation, and damages. *See Jones*, 730 N.E.2d at 1130 ("Expert testimony is necessary to establish both (1) the standard

of care expected of the professional[,] and (2) the professional's deviation from the standard."). In light of these questions, we do not see how Geldes' alleged conduct could be considered "so grossly negligent that a layperson could readily appraise." *See Advincula*, 678 N.E.2d at 1021.

The Administrators direct us to *Lincoln Cardinal Partners v. Barrick*, 578 N.E.2d 316 (Ill. App. Ct. 4th Dist. 1991) in support of their argument that the common knowledge rule should be applied. This reliance is misplaced. The issue in *Lincoln Cardinal Partners* was whether the participant, third party in the transaction should have recognized that the principal's agent was acting improperly or in conflict with the interests of his principal. *See id.* at 316-20 ("We hold here that a purported agent's otherwise apparent authority to contractually bind a principal to a third party is destroyed when a showing is made requiring the third party to recognize that a conflict of interest exists between the purported agent and the principal."). If so, then the participant could not indulge himself in the transaction's benefits.

As applied to this case, *Lincoln Cardinal Partners* could only be helpful if, say, Kotter filed suit against the Administrators and argued she was still entitled to her interest in the properties despite Geldes doing a substandard job in effecting the transactions. The Administrators (the principal) could rely on the case to argue that Kotter (the participant) cannot benefit from the transaction, like the participant, third party in

*Lincoln Cardinal Partners*, because Kotter should have recognized Geldes' (the agent's) shortcomings—e.g., her failure to (1) properly document the transactions, or (2) recognize the conflict of interest between Kotter and Hedstrom (as an agent benefitting from a transaction with her principal) or Geldes, Kotter, and Hedstrom (as an agent-attorney representing two distinct parties with competing interests).[4] This does not help the Administrators; the Administrators were not harmed by Kotter's failure to recognize some alleged form of malpractice. And as relevant here, *Lincoln Cardinal Partners* had nothing to do with the tort of legal malpractice, the use of expert testimony, or the standard of care required of an attorney. *Barth* sets forth the applicable guidance. That is what we follow.

Alternatively, the Administrators make a bald assertion that expert testimony would be improper, as well as unnecessary, because the Illinois Rules of Professional Conduct and the published case law "clearly state the legal standards controlling this case." But we agree with the district court that this argument is without merit. The Administrators rely on *Sohaey v. Van Cura*, 607

---

[4] The parties hotly contest whether Geldes was also representing Kotter in the transactions. The district court discussed the information that "suggest[ed] Geldes represented Kotter as well as Hedstrom in the two condominium purchases." *See Ball*, 746 F. Supp. 2d at 946-47. But our decision does not require a determination as to this issue, so we express no opinion as to whether a fiduciary relationship actually existed between Geldes and Kotter.

N.E.2d 253 (Ill. App. Ct. 2d Dist. 1992), and *LID Associates v. Dolan*, 756 N.E.2d 866 (Ill. App. Ct. 1st Dist. 2001) to bolster their contention; however, the cases only explain when expert testimony is *prohibited*, not when it is required. The court in *Sohaey* said experts cannot give testimony that "amounts to statutory interpretation," offer "legal conclusions" that a jury could make on its own, or "testify regarding what legal research shows with respect to a key legal term" that should be defined by the court. *Sohaey*, 607 N.E.2d at 283 (citations omitted). The court in *LID Associates* similarly noted that an expert witness cannot give testimony "amounting to statutory interpretation" or regarding "legal conclusions" and opinions based on the "interpretation of case law." *LID Assocs.*, 756 N.E.2d at 876-77 (citations omitted). Without rehashing our prior discussion of why expert testimony was required here, we do not believe expert testimony in this case would amount to any of the prohibited forms of testimony.

The allegations and information in this case required Ball to present expert testimony as to the standard of care required of Geldes. Accordingly, the Administrators' inability to present the required expert testimony in this case is fatal to their legal malpractice claim. The district court properly granted summary judgment in favor of Geldes.

### B.  Breach of Fiduciary Duty Claim Against Kotter

We next address the district court's grant of summary judgment in favor of Kotter.  In doing so, we again note

that we are not prohibited under the Illinois Dead Man's Act from considering Geldes' testimony and, like the district court, will consider it when necessary.

The Administrators contend Kotter breached the fiduciary duty she owed Hedstrom as his real estate agent. This is simpler than a negligence claim in that "the relevant standard of care in a negligence claim encompasses a broader range of conduct than is covered by a fiduciary duty and that a negligence claim for legal malpractice is based in tort, while a claim for breach of fiduciary duty is founded on principles of agency, contract, and equity." *Pippen v. Pederson & Houpt*, 986 N.E.2d 697, 2013 IL App. (1st) 111371, at ¶28 (Ill. App. Ct. 1st Dist. Feb. 26, 2013). To succeed in a claim for breach of fiduciary duty, a plaintiff must prove the following elements: (1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) the breach proximately caused the injury of which the plaintiff complains. *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000).

As to the first element, it is widely understood that a fiduciary relationship "may arise as a matter of law, such as between an agent and principal, or it may be moral, social, domestic, or personal." *Kurtz v. Solomon*, 656 N.E.2d 184, 190 (Ill. App. Ct. 1st Dist. 1995). The parties do not dispute on appeal that Kotter was Hedstrom's agent, as a matter of law or as a matter of fact.[5] Therefore, as it

---

[5] The district court concluded that the undisputed facts and circumstances in this case demonstrated that Kotter owed a
(continued...)

relates to elements two and three, Kotter had a duty to treat Hedstrom with "the utmost candor, rectitude, care, loyalty, and good faith." *See Benson v. Stafford*, 941 N.E.2d 386, 397 (Ill. App. Ct. 1st Dist. 2010). The overall question presented in this appeal is whether a reasonable juror could conclude that Kotter breached her fiduciary duty and that the breach proximately caused harm to Hedstrom's estate.

### 1. Presumption Background

The parties agree that the outcome of this case hinges on the interpretation and interplay of two "strong" presumptions arising in agency law that directly relate to the Administrators' breach of fiduciary claim against Kotter: the presumption of undue influence and the presumption of fraud.

The presumption of undue influence has been defined as "any improper . . . urgency of persuasion whereby the will of a person is overpowered and he is induced to

[5] (...continued)

fiduciary duty to Hedstrom because of her position as his real estate agent, as well as because of the agency relationship between Kotter and Hedstrom that "went beyond a typical real estate broker-client relationship." *See Ball*, 2012 U.S. Dist. LEXIS 38739, at *32-33 (citing *Ioerger v. Halverson Constr. Co.*, 902 N.E.2d 645, 648 (Ill. 2008)). Our analysis does not require us to resolve the question as to what relationship between the parties or underlying fact establishes the fiduciary duty as a matter of law.

do or forbear an act which he would not do or would do if left to act freely." *Franciscan Sisters Health Care Corp. v. Dean*, 448 N.E.2d 872, 875 (Ill. 1983) (hereinafter *Franciscan Sisters*). Similarly, the presumption of fraud is generally understood to mean as follows: "[w]here the existence of a fiduciary relationship has been established, the law presumes that any transactions between the parties, by which the dominant party has profited, are fraudulent." *Jones v. Washington*, 107 N.E.2d 672, 674 (Ill. 1952). Under Illinois law, the names of each presumption are used almost interchangeably, *see Hofert v. Latorri*, 174 N.E.2d 866, 869 (Ill. 1961) ("The defendants made no effort to rebut the presumption of *fraud* and *undue influence* that arose from the proof that a confidential relationship existed and that the dominant party had gained from the transaction.") (emphasis added), and the principles underlying each overlap. *Compare Long v. Lyon*, 726 N.E.2d 187, 193 (Ill. App. Ct. 4th Dist. 2000) (explaining that the defendant "did not meet his burden of showing that he exercised good faith and did not betray the confidence reposed in him" during the transaction), *with Franciscan Sisters*, 448 N.E.2d at 877 (stating that attorneys who stand to gain from wills they prepared for their clients must demonstrate "they are not defrauding or unduly influencing their clients"). To the extent the Administrators contend there are two completely separate lines of authority—one for *will contests* and one for *transactions*—we disagree. Both presumptions arise from a fiduciary's general duty to "refrain from seeking a selfish benefit during the relationship," s*ee Neade*, 739 N.E.2d at 500 (internal quotation marks omit-

ted), be it in a transaction, the drafting of a will, or the preparation of a trust.

When applicable, these presumptions create a prima facie case as to the disputed issue; they do not shift the burden of proof in the case. *Franciscan Sisters*, 448 N.E.2d at 876. Rather, "the presence of a presumption in a case only has the effect of shifting to the party against whom it operates the burden of going forward and introducing evidence to meet the presumption." *Diederich v. Walters*, 357 N.E.2d 1128, 1131 (Ill. 1976). But once the party on the adverse side of the presumption introduces sufficient evidence to rebut the presumption, the "bubble bursts" and the presumption vanishes. *Dep't of Cent. Mgmt. Servs. v. Ill. Labor Relations Bd.*, 902 N.E.2d 1122, 1134 (Ill. App. Ct. 4th Dist. 2009). The issue is then decided as if no presumption ever existed. *Lipscomb v. Sisters of St. Francis Health Servs., Inc.*, 799 N.E.2d 293, 298 (Ill. App. Ct. 1st Dist. 2003). Illinois courts have required "clear and convincing" evidence to overcome the presumptions of fraud and undue influence. *Franciscan Sisters*, 448 N.E.2d at 878; *see R.J. Mgmt. Co. v. SRLB Dev. Corp.*, 806 N.E.2d 1074, 1081 (Ill. App. Ct. 2d Dist. 2004) (explaining that the "clear and convincing" standard applies to "strong" presumptions that typically arise "where the party challenging the presumption was a fiduciary of the party receiving the favor of the presumption"). Conversely, if the party is unable to offer "clear and convincing" evidence to the contrary of the presumption, the prima facie case will support a finding as to the issues involved. *See Franciscan Sisters*, 448 N.E.2d at 876 (citations omitted); *Diedrich*, 357 N.E.2d at 1132.

### 2. Rebutting the Presumption

The district court correctly concluded that the presumption of fraud applies here. (We refer to the applicable presumption as one of *fraud* for convenience and in accordance with the parties' briefing.) Neither party disputes that on appeal.[6] It follows that, in order to overcome the presumption, Kotter must demonstrate by clear and convincing evidence that the transactions involving the Units were fair and did not result from any undue influence. *See In re Estate of Pawlinski*, 942 N.E.2d 728, 736-37 (Ill. App. Ct. 1st Dist. 2011); *Miller*, 778 N.E.2d at 267. This is a determination the court can make as a matter of law, that is, whether the "bubble has burst" and whether the case should then be decided on factual matters. *Compare Franciscan Sisters*, 448 N.E.2d at 878 ("Our decision here affirms the appellate court, which held that after the presumption is rebutted *as a matter of law* '[w]hat remains is a factual question, and we remand the cause to the trial judge as trier of fact to assess the strength of the evidence." (quoting 429 N.E.2d 914, 921 (Ill. App. Ct. 4th Dist. 1981)) (emphasis added), *with Spring Valley Nursing Ctr., L.P. v. Allen*, 977

---

[6] Kotter argued in the district court that the presumption of donative intent, which arises with the creation of a joint tenancy, cancelled out the presumption of fraud as to Unit 4705. *See Murgic v. Granite City Trust & Savings Bank*, 202 N.E.2d 470, 472 (Ill. 1964); *Miller v. Ford*, 778 N.E.2d 262, 269 (Ill. App. Ct. 5th Dist. 2002). The district court properly rejected that contention, quoting *In re Estate of DeJarnette*, 677 N.E.2d 1024, 1029 (Ill. App. Ct. 4th Dist. 1997).

N.E.2d 1230, 1234 (Ill. App. Ct. 3d Dist. 2012) ("A trial court's determination as to whether a presumption of fraud has been overcome, made *after an evidentiary hearing*, is entitled to deference and will not be reversed on appeal unless it is against the manifest weight of the evidence.") (emphasis added). And in making this determination, Illinois courts consider three "significant" factors, also known as the *McFail* factors: whether (1) the fiduciary made a full and frank disclosure of all relevant information that he had; (2) the fiduciary paid adequate consideration; and (3) the principal had competent and independent advice. *E.g.*, *McFail v. Braden*, 166 N.E.2d 46, 52 (Ill. 1960); *Miller*, 778 N.E.2d at 267.

Kotter claims that Hedstrom intended for the Units to be "gifts"; Kotter must therefore provide clear and convincing evidence supporting that intention. Simply put, she must show that the transfer of title to Kotter, as a result of the joint tenancy or through the Kotter Family Trust, "was the result of full and free deliberation on the part of [Hedstrom]." *See Lemp v. Hauptmann*, 525 N.E.2d 203, 206 (Ill. App. Ct. 5th Dist. 1998). If Kotter is unable to do that, she automatically loses. We thus turn our focus to whether Kotter provided sufficient evidence to rebut the presumption.

### i. Lack of Consideration

Central to our inquiry here is Kotter's admission that she did not provide any "consideration" regarding the titling of either Unit. This includes "natural love and affection," which courts often evaluate in the context of a deed to the

relatives of a grantor—though we take no position regarding the particular relationship between Kotter and Hedstrom here. *Cf. Boryca v. Parry*, 181 N.E.2d 124, 129 (Ill. 1962). The Administrators have steadfastly relied on Kotter's admission because they believe the presumption of fraud arising from a transaction can *never* be overcome without providing adequate consideration. Conversely, Kotter claims that the consideration factor is irrelevant in this case because the Units were gifts, and it necessarily follows that a gift would not be accompanied by consideration. *See Provena Covenant Med. Ctr. v. Dep't of Revenue*, 925 N.E.2d 1131, 1151 (Ill. 2010) ("It is a fundamental principle of law . . . that a gift is a voluntary, gratuitous transfer of property by one to another, and that [i]t is essential to a gift that it should be without consideration.") (internal quotation marks and citation omitted).

The Administrator's contention has more than a scintilla of support; some cases involving the presumption of fraud have essentially been decided on the issue of consideration alone. *See, e.g.*, *Falcon v. Thomas*, 629 N.E.2d 789, 794-96 (Ill. App. Ct. 4th Dist. 1994). But the Administrators have not directed us to, and we are unable to find, a single case in Illinois holding that the presumption of fraud cannot be rebutted *unless* adequate consideration is provided. Rather, Illinois case law evinces an intent to treat the *McFail* factors as just that, factors, as opposed to mandatory elements that must be satisfied. *See Klaskin v. Klepak*, 534 N.E.2d 971, 975 (Ill. 1989) (explaining that the *McFail* factors are "[s]ome of the factors which this court deems *persuasive*") (empha-

sis added). Courts would not regularly look to all the factors if a lack of consideration was always determinative of the issue. *See, e.g.*, *Hofert*, 174 N.E.2d at 869 (concluding that the presumption of fraud and undue influence was not rebutted because the defendants did not show that adequate consideration was paid or that the grantor received any independence advice regarding the constructive trust); *Long*, 726 N.E.2d at 191-93 (concluding that the presumption of undue influence was not overcome because there was no evidence that (1) the defendant made a full and frank disclosure of the relevant information; (2) the defendant paid adequate consideration; or (3) the decedent had competent and independent advice.

As explained in a more-recent Illinois appellate court decision,

> [The Illinois] supreme court has looked to several factors in determining whether the presumption of undue influence has been overcome, including whether (1) the attorney made a full and frank disclosure of all relevant information; (2) the client's agreement was based on adequate consideration; and (3) the client had independent advice before completing the transaction. *In re Marriage of Pagano*, 607 N.E.2d 1242, 1247 (Ill. 1992). Other Illinois decisions have considered slightly different factors, including whether (1) the agreement was offered by the lawyer with unquestionable good faith and with complete disclosure, (2) the client entered into the agreement with a full understanding of all facts and their legal

importance; and (3) the client's decision was free from undue influence and was fair. *Id.* at 1248.

*Bruzas v. Richardson*, 945 N.E.2d 1208, 1215 (Ill. App. Ct. 1st Dist. 2011).

This explanation makes sense given that the presumption of fraud can arise in many different situations and contexts, including when a grantor gives a gift to a fiduciary. If consideration was always required to rebut the presumption of fraud, a *gift*—"a voluntary, gratuitous transfer of property by one to another," *Provena Covenant Med. Ctr.*, 925 N.E.2d at 1151—could never be made to a fiduciary. We decline to interpret Illinois law in that fashion.[7]

In short, Kotter faces an uphill battle in trying to rebut the presumption of fraud because adequate considera-

---

[7] We are cognizant of the cases involving the presumption of fraud that arise from a debtor's conveyance of property that is allegedly made to avoid paying a valid creditor. In those cases, the party can only rebut the presumption of fraud by demonstrating adequate consideration was paid or the party retained sufficient assets to pay the creditor. *See, e.g., Falcon*, 629 N.E.2d at 794-97; *Regan v. Ivanelli*, 617 N.E.2d 808, 814-15 (Ill. App. Ct. 2d Dist. 1993). Those cases are easily distinguished, however, because the presumption in those cases is based in statutory law, not Illinois common law. *Cf. Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 943 (Ill. App. Ct. 1st Dist. 2007) ("This presumption [of fraud] stems for a public policy against [fiduciaries] using their position of trust and power to take unfair advantage of clients in transactions.").

tion was not paid. But contrary to the crux of the Administrators' appeal, it is not "impossible." Kotter must simply do it by providing evidence that satisfies the other relevant factors. *See, e.g., Klaskin*, 534 N.E.2d at 975-979.

### ii.   Other Relevant Factors

Having rejected the Administrators' contention that adequate consideration was necessary to rebut the presumption of fraud here, we look to the other relevant factors: whether (1) the titling of the Units was made with unquestionable good faith and with complete disclosure, and (2) Hedstrom assented to the titling of the Units with a full understanding of all facts and their legal importance. *See Bruzas*, 945 N.E.2d at 1215. Kotter has satisfied those factors.

The evidence establishes, first, that Hedstrom received complete and adequate disclosure of the relevant facts regarding the titling of the Units. Geldes contends that she explained to Hedstrom the legal consequences of titling the Units in the different ways. *Cf. Miller*, 778 N.E.2d at 267 (stating that "the lack of having a disinterested attorney question the decedent regarding his understanding of a transaction meant that the presumption was not overcome" (citing *Klaskin*, 534 N.E.2d at 976)). Geldes explicitly stated in her affidavit, "After listening to his options, Mr. Hedstrom told me that he wanted to take the Properties jointly with rights of survivorship because he wanted to take care of Cherie Kotter and ensure that the Properties would pass to

Kotter upon his death as he was leaving several other properties he owned to his children." There is no evidence to contradict this assertion regarding Unit 4705.

Regarding Unit 1518, Geldes' email to Hedstrom on September 18 specifically stated, "The power of attorney assigns the rights under the contract to the Kotter Family Trust. The Kotter Family Trust will own the property not Don and Cherie as joint tenants." This email, coupled with Geldes' calls to Hedstrom, constitutes complete disclosure as to Unit 1518. And in any event, even if Unit 1518 had been titled to Kotter and Hedstrom as "joint tenants with rights of survivorship" as originally discussed, complete title to the Unit would have passed to Kotter upon Hedstrom's death. The fact that Hedstrom changed his mind and allowed Kotter to take complete title to Unit 1518 at an earlier point in time is not inconsistent with the series of events and the information in the record. Nor does it destroy Geldes' competent, independent legal advice.

The Administrators contend this factor falls in their favor because of Kotter's admission that *she* did not provide any "competent and independent advice" to Hedstrom regarding the titling of either Unit. This is a red herring. As Kotter astutely points out, real estate agents are prohibited from offering such advice because it is within the purview of "the practice of law," which she is not licensed to do. *See Chi. Bar Assoc. v. Quinlan & Tyson, Inc.*, 214 N.E.2d 771, 772-75 (Ill. 1966). We reject this argument without further discussion.

The evidence also establishes that Hedstrom had a full understanding of all relevant facts. The parties all

agree that Hedstrom was a sophisticated business man who owned numerous other properties. In addition to Geldes' testimony that she spoke to Hedstrom about the Units, each of the letters and emails explicitly states how the properties were to be titled. A presumption exists that they were all properly sent, received, and read. *See Kennell v. Gates*, 215 F.3d 825, 829 (8th Cir. 2000). And there is no evidence that Hedstrom did not read the emails or comprehend their contents. This presumption is further bolstered by Hedstrom's strongly-worded email to Geldes on July 31 in which he said that he would get a new attorney if Geldes did not comply with his demands. If Hedstrom was displeased with something, he made those concerns known. Furthermore, Hedstrom attended the closing for Unit 4705 and, according to Geldes, was fully aware of how the deed was being prepared. Including the deed, no fewer than four documents regarding Unit 4705 referred to the Unit as being titled to Hedstrom and Kotter as joint tenants with rights of survivorship.

With respect to Unit 1518, the most convincing evidence in favor of Kotter's position is the POA that Hedstrom signed and had notarized. The POA specifically stated, "The Kotter Family Trust will own the property not Don and Cherie as joint tenants." That language is neither complex nor ambiguous. Again, Hedstrom owned numerous properties, and there is no evidence that Hedstrom did not understand the language in the POA. Instead, the evidence indicates that Hedstrom assented to the titling of Unit 1518 with a full understanding of the facts and their legal consequences.

We think the evidence Kotter provided is "clear and convincing" despite the Administrators' attempt to direct us to a number of hypothetical, speculative "issues." *See Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013) ("[O]ur favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture."). These include the Administrators' assertions that: (1) Hedstrom receiving and responding to emails "in the past" cannot be used to satisfy the "clear and convincing" standard of "receipt and understanding"; (2) Unit 4705 was mentioned in Hedstrom's will and living trust; (3) there is no evidence as to Hedstrom's mindset in transferring the title of Unit 1518 to the Kotter Family Trust; (4) the POA used at the closing for Unit 1518 was not the POA that Geldes prepared and sent to Hedstrom; and (5) there is no evidence that Hedstrom "actually received, read or understood" the POA or its effect on his estate.

Regarding the first assertion, this conclusory statement lacks any support. As we stated above, a presumption exists that the emails were received and read, and Hedstrom's letters and conduct indicate that he received and read them. When Hedstrom disagreed with what Geldes said in an email, he told Geldes without reservation. When the email directed Hedstrom to sign the POA and have it notarized, he did that and sent the POA back to Geldes. This is enough. The Administrators have not put forth any evidence to the contrary of the presumption, so despite the Administrators' contention that the presumption of receipt is not "evidence," the presumption of receipt is binding and can be used

to defeat the presumption of fraud. *See Evidence*, BLACK'S LAW DICTIONARY 595 (8th ed. 2004) ("Something (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact.").

Looking to the second assertion, the information included in Hedstrom's will and living trust is entirely consistent with the titling of the Units. First, neither the will nor the living trust mentions Unit 1518. That makes sense because Hedstrom had no interest in the property; it was titled to the Kotter Family Trust. There was no reason to include a property in Hedstrom's estate-planning documents if he did not have a present or future interest in it. Next, Hedstrom did have an interest in Unit 4705. His will and living trust were in preparation for the possible situation where Kotter predeceased him. If Kotter had predeceased Hedstrom, Hedstrom would have taken full title to the property. Hedstrom, who the parties agree was in control of his financial affairs, was planning for all possible situations. That is presumably why Unit 4705 was included in the will and living trust while Unit 1518 was not. This does not contradict the titling of the Units or dictate a different conclusion regarding Hedstrom's overall intent.

The third assertion, that we do not know Hedstrom's particular mindset in titling Unit 1518 to the Kotter Family Trust, is somewhat true, but it is inconsequential to our conclusion. All of the evidence establishes that Hedstrom wanted Unit 1518 to be titled to the Kotter

Family Trust. The specific reason he made this choice, be it for tax purposes or his desire to provide for Kotter after he died, does not matter. All that matters is Hedstrom understood the legal consequences of his decision; the uncontroverted evidence indicates he did.

The Administrators' fourth argument, that we do not know who changed the provisions in the POA Geldes sent on September 18, which listed Geldes, and the one presented at the closing, which listed Kotter, is much ado about nothing. The record demonstrates that the parties were initially unsure as to whether Kotter would be able to attend the closing for Unit 1518. That is why more than one POA was prepared. Once it was certain that Kotter could attend the closing, however, it made sense that Hedstrom would use the POA that listed Kotter because Kotter was the person essentially receiving title to Unit 1518. And we repeat, no party contends that the POA used at the September 18 closing was not validly executed or did not include Hedstrom's signature. The Administrators' claim that the POA could have been altered or doctored in some fashion is pure speculation and conjecture. In light of this, we reject the Administrators' contention that the POA was "invalid under the controlling law and cannot be used to establish Mr. Hedstrom's knowledge, under-standing or intent[.]"

The Administrator's final contention, that there is no evidence Hedstrom received, read or understood the POA or its effect, is a repeating of the Administrators' other arguments, albeit phrased differently. It is unneces-

sary for us to again explain why we think Hedstrom received, read, and understood the POA.

In sum, Kotter has presented "clear and convincing" evidence that the Units were given to her as "gifts" and that Hedstrom did so with a full understanding of the legal consequences of his decision. Kotter has demonstrated that the transactions were fair and, therefore, has sufficiently rebutted the presumption of fraud. *See Franciscan Sisters*, 448 N.E.2d at 878.

### 3.   Breach of Fiduciary Duty Element

Because Kotter has "burst the bubble" and overcome the presumption of fraud, the Administrators must point to an issue of material fact in order to survive Kotter's motion for summary judgment. *See Cloe*, 712 F.3d at 1176; *Dep't of Cent. Mgmt. Servs.*, 902 N.E.2d at 1134. We are not convinced they have done that.

The Administrators' claim requires them to prove at trial that Kotter breached a fiduciary duty owed to Hedstrom. *See 1515 N. Wells, L.P. v. 1513 N. Wells, L.L.C.*, 913 N.E.2d 1, 11 (Ill. App. Ct. 1st Dist. 2009). Kotter could only breach a fiduciary duty owed if she did not treat Hedstrom with "the utmost candor, rectitude, care, loyalty, and good faith." *See Benson*, 941 N.E.2d at 397. In other words, if Kotter helped procure the outcome of the real estate transactions that Hedstrom wanted, then there was no breach. *See Clark v. Clark*, 76 N.E.2d 446, 451 (Ill. 1947) ("Contracts and transactions between parties to a fiduciary relation, if open, fair and honest

when deliberately made are as valid as contracts between other parties.").

The Administrators' conclusory statement that Kotter breached her duty because the Units were not titled in accordance with Hedstrom's wishes lacks any real support. The only direct support the Administrators can point to is the July 26 letters in which Geldes wrote, "At closing, title for Unit shall be conveyed by warranty deed to Mr. Donald Hedstrom." The problem for the Administrators is all the documents and admissible testimony after that point demonstrate that Hedstrom did not want title to the properties to be solely in his name. As we have explained, the undisputed evidence demonstrates that Hedstrom received complete and adequate information regarding the Units' titling and that he knew exactly what he was doing during the transactions, regardless of the future tax implications on his estate.

Accordingly, the Administrators are unable to demonstrate that a reasonable juror could find in their favor on the issue of breach, an essential requirement of their claim. And when a party cannot prove an essential element of a claim at trial, summary judgment against that party is appropriate. *See Majors v. GE Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) ("Summary judgment is appropriate if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party with bear the burden of proof at trial.'" (quoting *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 646 (7th Cir. 2011))). We

believe the district court properly granted summary judgment in favor of Kotter and against the Administrators.

## III. CONCLUSION

The Administrators cannot succeed at trial on either of their claims. We AFFIRM the judgment of the district court.